ORAL ARGUMENT NOT YET SCHEDULED

IN THE

## United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 15-3044
(Consolidated with Nos. 15-3048, 15-3089, 15-3091)

UNITED STATES OF AMERICA
                    Plaintiff-Appellee,

          v.

SHERRI DAVIS,
ANDRE DAVIS,

                    Defendant-Appellants

On Appeal from the United States District Court
For the District of Columbia

---

### JOINT BRIEF OF APPELLANTS

---

Adam H. Kurland
Howard University School of Law
2900 Van Ness St. NW
Washington, DC 20008
(202) 806-8063

Attorney for Sherri Davis
(appointed by this Court)


District Court
No. 14-cr-0037 (TFH)

A.J. Kramer
Federal Public Defender
Beverly G. Dyer
Assistant Federal Public Defender
625 Indiana Ave., N.W.,  Suite 550
Washington, D.C.
(202) 208-7500

Attorney for Andre Davis
(appointed by this Court)

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

Defendant-appellants Sherri Davis and Andre Davis, hereby certify, pursuant to D.C. Circuit Rule 28(a)(1):

**A.     Parties and Amici**: Defendant-appellants Sherri Davis and Andre Davis appeal from the criminal prosecution of them by plaintiff-appellee, the United States of America.  There are no intervenors or *amici*.

**B.     Rulings Under Review**:  Appellant Andre Davis appeals the denial of his motions for judgment of acquittal and to set aside the verdict.  JA-1130-1131; 1/27/15:177; JA-0276.  Both appellants appeal the denial of their motions for new trial pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963).  JA-1705-1723.  Sherri Davis appeals the district court's grant of the government's motion in limine, excluding the testimony of her expert witness.  *United States v. Davis*, 78 F. Supp.3d 17 (D.D.C. 2015).  Sherri Davis also appeals the district court's denial of her motion for new trial based on the government's closing argument.  JA-0276.  In addition, Andre Davis challenges the government's improper closing argument.    Both appellants appeal the sentences imposed by the district court (the Honorable Thomas F. Hogan).  JA-0349-0353; JA-0354-0360; JA-1559-1563; JA-1591-1594.  Sherri Davis appeals ineffective assistance of counsel.  There are no intervenors or *amici*, and the district court issued no additional published opinions.

# TABLE OF CONTENTS

**PAGE**

CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

GLOSSARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xii

JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

CONSTITUTIONAL, STATUTORY, AND GUIDELINES PROVISIONS . . . . . 1

ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

1.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

2.    The Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      A.    The Government's Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      B.    Closing Arguments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

3.    Motions for Judgment of Acquittal, New Trial and to Set Aside
      Verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

4.    Sentencing Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

5.    The *Brady* Motions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

i

I.      THE GOVERNMENT'S EVIDENCE AGAINST ANDRE DAVIS
        WAS INSUFFICIENT ........................................  17

        A.      Standard of Review ....................................  17

        B.      No Rational Jury Could Convict Andre Davis of
                Aiding in Filing a False 2012 Return for Thomas
                Jaycox ...............................................  18

        C.      No Rational Jury Could Convict Andre Davis of
                Conspiracy ...........................................  22

II.     SHERRI DAVIS SHOULD RECEIVE A NEW TRIAL BASED
        ON THE GOVERNMENT'S *BRADY* VIOLATION FOR FAILING
        TO TIMELY PRODUCE THE STAR COOPERATING WITNESS'
        PRIOR STATEMENT WHERE SHE ADMITTED HER OWN
        TAX RETURNS WERE FRAUDULENT .........................  28

        A.      Standard of Review ....................................  28

        B.      *Brady* Principles .......................................  28

        C.      Sherri Davis Established Sufficient Prejudice to Require
                a New Trial on all Counts ..............................  30

III.    THE COURT BASED ITS DENIAL OF ANDRE DAVIS'S BRADY
        MOTION ON CLEARLY ERRONEOUS FACTUAL FINDINGS .....  43

        A.      Standard of Review ....................................  43

        B.      The District Court Made Clearly Erroneous Factual Findings
                in Concluding that the Failure to Disclose Exculpatory Evidence
                Did Not Prejudice Andre Davis ..........................  44

IV.     THE DISTRICT COURT COMMITTED REVERSIBLE ERROR
        BY EXCLUDING EXPERT TESTIMONY THAT SHERRI DAVIS
        HAS ADHD ...............................................  47

ii

|       | A. | Standard of Review ..................................... | 47 |
|-------|----|--------------------------------------------------|----|
|       | B. | Sherri Davis' Psychiatric Expert Proffered Relevant Evidence That Was Not Confusing ........................ | 47 |
| V.    | THE DISTRICT COURT ABUSED ITS DISCRETION BY NOT GRANTING SHERRI DAVIS A NEW TRIAL BASED ON THE GOVERNMENT'S INCENDIARY AND IMPROPER COMMENTS DURING CLOSING REBUTTAL ARGUMENT ................. | | 54 |
|       | A. | Standard of Review ..................................... | 54 |
|       | B. | The Government's Rebuttal Comments Warrant Reversal ....... | 54 |
|       | C. | The Improper Comments Were Sufficiently Egregious to Warrant a New Trial ................................... | 56 |
| VI.   | THE GOVERNMENT'S CLOSING ARGUMENT PLAINLY MISREPRESENTED THE EVIDENCE AGAINST ANDRE DAVIS ................................................ | | 64 |
|       | A. | Standard of Review ..................................... | 64 |
|       | B. | The Prosecutor Misrepresented Banking Evidence, as well as the LaDonna Conversation and Other Evidence Against Andre Davis .................................... | 64 |
| VII.  | THE COURT ERRED OR PLAINLY ERRED IN CALCULATING ANDRE DAVIS'S SENTENCING GUIDELINES, AND BOTH APPELLANTS' LOSS AND RESTITUTION ...................... | | 68 |
|       | A. | Standard of Review ..................................... | 68 |
|       | B. | The Court's Loss Finding for Andre Davis Did Not Support Its Guidelines Calculation ................................... | 69 |

C.   For Both Defendants, the District Court Failed to Resolve
     Objections to the Government's Loss Allegations and Failed
     to Make Required Factual Findings . . . . . . . . . . . . . . . . . . . . . . . . .  70

D.   The Court Erred or Plainly Erred in Calculating
     Restitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  78

VIII.  SHERRI DAVIS' TRIAL COUNSEL RENDERED
       CONSTITUTIONALLY INADEQUATE REPRESENTATION . . . . . . .  80

A.   The Alternative Mistrial Remedy . . . . . . . . . . . . . . . . . . . . . . . . . .  80

     1.   Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  80

     2.   The Record Sufficiently Establishes a New Trial
          is Required . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  80

B.   Other Instances of Ineffective Assistance of Counsel Raise
     "Colorable Claims" Which Require Remand . . . . . . . . . . . . . . . . . .  82

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  84

CERTIFICATE OF LENGTH

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

<div align="center"><b><u>CASES</u></b>                                    <b><u>PAGE</u></b></div>

*Brady v. Maryland*, 373 U.S. 83 (1963)
. . . . . . . . . . . . . . . . . . . . 5, 12, 13, 14, 15, 26, 28, 29, 30, 31, 32, 33, 34, 35,
. . . . . . . . . . . . . . . . 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 47, 68, 80, 82, 83

*Brown v. United States*, 370 F.2d 242 (D.C. Cir. 1966) . . . . . . . . . . . . . . . . . . . 58

*Chambers v. Mississippi*, 410 U.S. 284 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Cone v. Bell*, 556 U.S. 449 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Davis v. Alaska*, 415 U.S. 308 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Direct Sales Co. v. United States*, 319 U.S. 703 (1943) . . . . . . . . . . . . . . . . . . . 26

*Gilliam v. United States*, 269 F.2d 770 (D.C. Cir. 1959) . . . . . . . . . . . . . . . . . . 70

*Greenlaw v. United States*, 554 U.S. 237 (2008) . . . . . . . . . . . . . . . . . . . . . . . . 70

*Ingram v. United States*, 360 U.S. 672 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*In re Sealed Case*, 527 F.3d 188 (D.C. Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . 69

*Jackson v. Virginia*, 443 U.S. 307 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Koon v. United States*, 518 U.S. 81 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Kyles v. Whitley*, 514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Lakeside v. Oregon*, 435 U.S. 333 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

─────────────────────

\* Authorities principally relied upon are marked with an asterisk.

<div align="center">v</div>

*Molina-Martinez v. United States*, 136 S. Ct. 1338 (2016) . . . . . . . . . . . . 69, 70

*Napue v. Illinois*, 360 U.S. 264 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Porter v. McCollum*, 558 U.S. 30 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Rosemond v. United States*, 134 S. Ct. 1240 (2014) . . . . . . . . . . . . . . . . . . . . 21

*Smith v. Cain*, 132 S.Ct. 627 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Bagley*, 473 U.S. 667 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Barker*, 553 F.2d 1013 (6th Cir. 1977) . . . . . . . . . . . . . . . . . . 58

*United States v. Beeks*, 224 F.3d 741 (8th Cir. 2000) . . . . . . . . . . . . . . . . . . . 58

*United States v. Bishop*, 412 U.S. 346 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Brockenborrugh*, 575 F.3d 726 (D.C. Cir. 2009) . . . . . . . . . . . 68

*United States v. Brown*, 808 F.3d 865 (D.C. Cir. 2015) . . . . . . . . . . . . . . . . . . 69

*United States v. Bryant*, 128 F.3d 74 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . 75

*United States v. Burnett*, 2016 WL 3648520 (D.C. Cir. July 8, 2016) . . . . . . . . 77

*United States v. Carter*, 236 F.3d 777 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . 59

*United States v. Castle*, 2016 WL 3254307 (D.C. Cir. June 14, 2016) . . . . . . . . 20

*United States v. Childress*, 58 F.3d 693 (D.C. Cir. 1995) . . . . . . . . . . . 47, 48, 52

*United States v. Cohen*, 510 F.3d 1114 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . 53

* Authorities principally relied upon are marked with an asterisk.

*United States v. Cuffie*, 80 F.3d 514 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . 33

*United States v. Davis*, 78 F.Supp. 3d 17 (D.D.C. 2015) . . . . . . . . . . . . 48, 49, 51

*United States v. Fair*, 699 F.3d 508 (D.C. Cir. 2012) . . . . . . . . . . . . . . . . . . . 79

*United States v. Fareri*, 712 F.3d 593 (D.C. Cir. 2013) . . . . . . . . . . . . . . . . . 70

*United States v. Fennell*, 53 F.3d 1296 (D.C. Cir. 1995) . . . . . . . . . . . . . . . . . 80

*United States v. Gaskins*, 690 F.3d 569 (D.C. Cir. 2012) . . . . . . . . . . . . . . . . . 22

*\*United States v. Godoy*, 706 F.3d 493 (D.C. Cir. 2013) . . . . . . . . . . . . . . . . . 70

*United States v. Hall*, 413 F.3d 770 (8th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . 59

*United States v. Hall*, 610 F.3d 727 (D.C. Cir. 2010) . . . . . . . . . . . . . . . . . . . 69

*United States v. Henry*, 546 F.3d 367 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . 55

*\*United States v. Hite*, 769 F.3d 1154 (D.C. Cir. 2014) . . . . . . . . . . . . . . . . 52, 53

*\*United States v. Johnson*, 231 F.3d 43 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . 58

*\*United States v. Johnson*, 592 F.3d 164 (D.C. Cir. 2010) . . . . . . . . . . . . . . 29, 39

*United States v. Kerr*, 981 F.2d 1050 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . 60

*\*United States v. Kohring*, 637 F.3d 895 (9th Cir. 2011) . . . . . . . . . . . . 36, 37, 41

*\*United States v. Kpodi*, 2016 WL 3063507 (D.C. Cir. May 31, 2016) . . . . . . . 76

*United States v. Krasovich*, 819 F.2d 253 (9th Cir. 1987) . . . . . . . . . . . . . . . . . 26

\* Authorities principally relied upon are marked with an asterisk.

*United States v. Kynard*, 427 F. App'x 755 (11th Cir. 2011) . . . . . . . . . . . . . . .  76

*United States v. Lemire*, 720 F.2d 1327 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . .  79

\*United States v. Leonzo*, 50 F.3d 1086 (D.C. Cir. 1995)  . . . . . . . . . . . . . .  68, 78

*United States v. Lewis*, 626 F.2d 940 (D.C. Cir. 1980) . . . . . . . . . . . . . . . . . .  70

*United States v. Long*, 328 F.3d 655 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . .  47

\*United States v. Maddox*, 156 F.3d 1280 (D.C. Cir. 1998) . . . . . . . . . . . . . . . .  67

*United States v. McCants*, 434 F.3d 557 (D.C. Cir. 2006)  . . . . . . . . . . . . . . . .  77

*United States v. McCants*, 554 F.3d 155 (D.C. Cir. 2009)  . . . . . . . . . . . . .  68, 77

\*United States v. McGill*, 815 F.3d 846 (D.C. Cir. 2016)  . . . . . . . . . . . . . .  64, 68

*United States v. Mehta*, 594 F.3d 277 (4th Cir. 2010)  . . . . . . . . . . . . . . . . . . . .  76

*United States v. Mohammed*, 693 F.3d 192 (D.C. Cir. 2012)  . . . . . . . . . . . . . .  80

*United States v. Monaghan*, 741 F.2d 1434 (D.C. Cir. 1984) . . . . . . . . . . . . . .  56

*United States v. Moore*, 651 F.3d 30 (D.C. Cir. 2011)  . . . . . . . . . . . . . . . . . . .  67

\*United States v. Mouling*, 557 F.3d 658 (D.C. Cir. 2009)  . . . . . . . . . . . . . . . .  80

*United States v. Oruche*, 484 F.3d 590 (D.C. Cir. 2007) . . . . . . . . . . . . . . .  39, 40

\*United States v. Pasha*, 797 F.3d 1122 (D.C. Cir. 2015)
 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28, 29, 30, 40, 44, 47, 82

---

\* Authorities principally relied upon are marked with an asterisk.

*United States v. Pelullo*, 105 F.3d 117 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . .  42

*\*United States v. Pole*, 741 F.3d 120 (D.C. Cir. 2013)  . . . . . . . . . . . . . . . .  79, 82

*United States v. Rojas*, 520 F.3d 876 (8th Cir. 2008) . . . . . . . . . . . . . . . . . . . .  54

*United States v. Salerno*, 902 F.2d 1429 (9th Cir. 1990)  . . . . . . . . . . . . . . . . . .  26

*\*United States v. Sanchez*, 659 F.3d 1252 (9th Cir. 2011)  . . . . . . . . . . .  57, 59, 60

*United States v. Sandoval-Mendoza*, 472 F.3d 645 (9th Cir. 2006) . . . . . . . . . . .  52

*\*United States v. Saro*, 24 F.3d 283 (D.C. Cir. 1994)  . . . . . . . . . . . . . . . . . . . .  69

*\*United States v. Schroeder*, 536 F.3d 746 (7th Cir. 2008) . . . . . . . . . . . . . .  75, 78

*\*United States v. Smith*, 77 F.3d 511 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . .  33

*United States v. Solivan*, 937 F.2d 1146 (6th Cir. 1991)  . . . . . . . . . .  58, 59, 60, 63

*United States v. Straker*, 800 F.3d 570 (D.C. Cir. 2015),
    *cert. denied*, 136 U.S. 1170 (2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

*United States v. Toto-Ngosso*, 407 F. App'x 687 (4th Cir. 2011) . . . . . . . . . . . . .  76

*\*United States v. Valdez*, 723 F.3d 206 (D.C. Cir. 2013) . . . . . . . . . . . . . . .  67, 68

*United States v. Vega*, 2016 WL 3457715 (D.C. Cir. June 24, 2016) . . . . . .  28, 78

*United States v. Venable*, 269 F.3d 1086 (D.C. Cir. 2001)  . . . . . . . . . . . . . . . .  64

*United States v. Watson*, 171 F.3d 695 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . .  67

---

\* Authorities principally relied upon are marked with an asterisk.

ix

*United States v. West*, 393 F.3d 1302 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . 47

*United States v. White*, 241 F.3d 1015 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . 56

*United States v. Wright*, 665 F.3d 560 (3d Cir. 2012) . . . . . . . . . . . . . . . . . . . 41

*\*Wearry v. Cain*, 136 S. Ct. 1002 (2016) . . . . . . . . . . . . . . . . . . . . . . . . 35, 40, 44

*\*Wolfe v. Clarke*, 691 F.3d 410 (4th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . 38

## STATUTES, RULES, AND GUIDELINES,

\*U.S. Const. - Fifth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 34, 44, 63

18 U.S.C. § 371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 26

18 U.S.C. § 1001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

\*18 U.S.C. § 3663A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

\*18 U.S.C. § 3664(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

18 U.S.C. § 3742(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

18 U.S.C. § 6002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

26 U.S.C. § 7206 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 21

Fed. R. Crim. P. 33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 54, 55, 56, 62, 63

Fed. R. Evid. 401(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

---

\* Authorities principally relied upon are marked with an asterisk.

Fed. R. Evid. 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 53

Fed. R. Evid. 404(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 41

Fed. R. Evid. 704(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Fed. R. Evid. 807 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

U.S.S.G. § 1B1.3(a)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

U.S.S.G. § 2T4.1 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

U.S.S.G. § 2T4.1 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

## OTHER AUTHORITIES

Cissel, James, *Federal Criminal Trials* (8th ed. 2013) . . . . . . . . . . . . . . . . . . . 57

Dostoevsky, Fydor, *Winter Notes on Summer Impressions*
    (P. Patterson 2d Paperback ed. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Wegner, Daniel, *White Bears and Other Unwanted Thoughts:*
    *Suppression, Obsession, and the Psychology of Mental*
    *Control* (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

---

\* Authorities principally relied upon are marked with an asterisk.

# GLOSSARY

| | |
|---|---|
| 2FT | 2FT Fast Facts Tax Service |
| ADHD | Attention Deficit/Hyperactivity Disorder |
| BOA | Bank of America |
| DC-OTR | D.C. Office of Tax and Revenue |
| DFS | Davis Financial Services |
| EFIN | Electronic Filing Identification Number |
| MOI | Memorandum of Interview |
| MVRA | Mandatory Victims Restitution Act |
| PSR | Presentence Investigation Report |

## UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

## NO. 15-3044
### (Consolidated with Nos. 15-3048, 15-3089, 15-3091)

---

## JOINT BRIEF OF APPELLANTS

---

**UNITED STATES OF AMERICA**
            **Plaintiff-Appellee,**
    **v.**

**SHERRI DAVIS,**
**ANDRE DAVIS,**
            **Defendant-Appellants.**

---

## JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 2241. This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). The district court sentenced both defendants on July 16, 2015. Sherri Davis filed a notice of appeal on July 20, 2015, and Andre Davis filed a notice of appeal on July 30, 2015. JA-0348; JA-0361. On December 16 and 18, 2015, respectively, defendants appealed the district court's denial of their motion for new trial. JA-0625-0626.

## CONSTITUTIONAL, STATUTORY, AND GUIDELINES PROVISIONS

Relevant constitutional provisions, statutes, guidelines, and rules, are included in the addendum to this brief.

## ISSUES PRESENTED FOR REVIEW

1. Whether the evidence was sufficient to convict Andre Davis of aiding and assisting in filing a false 2012 tax return for Thomas Jaycox and of conspiring with Sherri Davis to file false tax returns.

2. Whether the district court erred in concluding that the government's failure to disclose exculpatory evidence involving the government's star cooperating witness did not undermine confidence in the verdict for Sherri Davis.

3. Whether the district court relied on clearly erroneous facts in concluding that the omission of exculpatory evidence involving the cooperating witness did not undermine confidence in the verdict against Andre Davis.

4. Whether the district court erred in excluding the testimony of Sherri Davis's expert witness on ADHD.

5. Whether the government's rebuttal closing comment to the jury, that "[y]our job is to tell [Sherri Davis] to stop" filing false returns, denied Sherri Davis a fair trial.

6. Whether the government's misrepresentation of the evidence in its closing argument against Andre Davis was plain error.

7. Whether the district court erred in calculating Andre Davis's sentencing guidelines and in determining loss and restitution for both Andre and Sherri Davis.

2

8. Whether Sherri Davis received ineffective assistance of counsel.

## STATEMENT OF FACTS

### 1. Introduction

Appellants Sherri and Andre Davis were charged in a tax fraud conspiracy and other offenses involving a tax preparation business run from their home. From 2006 through 2011, Sherri Davis used the business name 2FT Fast Facts Tax Service ("2FT"), and IRS electronic filing identification numbers ("EFIN's") ending in "7786" and "0265." She charged fees of $99-500 to prepare returns for clients who received all of the remaining proceeds of allegedly inflated refunds.

In 2011, IRS agents executed a search warrant at the Davis home, where they found LaDonna Davis, Sherri's niece, who lived with Sherri and worked for 2FT beginning in 2006.[1] Months later, the government offered LaDonna a generous plea deal in exchange for her cooperation. At trial, she provided the only direct account of the alleged conspiratorial activity.

On October 31, 2011, the IRS expelled Sherri from its electronic filing program and suspended 2FT's EFIN numbers. Government Exhibit 1.84. On February 27, 2012, the IRS approved a new EFIN number ending in "0647," in the name of Davis Financial Services ("DFS"), listing as an officer Sherri's son, Andre

---

[1] For simplicity, the codefendants and the main cooperating witness, who share the last name, are referred to by their first names.

3

Davis. JA-0627-0629. Both Sherri and Andre first used that EFIN to file returns in early 2013.

On February 26, 2014, a grand jury returned a 16-count indictment against Sherri. On July 16, 2014, a superseding indictment was filed naming both Sherri and Andre. Count 1 charged both defendants with conspiracy to defraud the IRS by filing false tax returns in violation of 18 U.S.C. § 371. Counts 2 through 33 charged Sherri with aiding and assisting in the preparation and filing of specific false returns in violation of 26 U.S.C. § 7206(2). Andre was also charged with violating § 7206(2) in counts 6, 15, 19, and 22. Counts 34 through 36 charged Sherri with filing personal false returns in violation of 26 U.S.C. § 7206(1). JA-0038-0057.[2]

Before trial, after a *Daubert* hearing, the court granted the government's motion in limine to exclude the testimony of Sherri's expert witness regarding Attention Deficit/Hyperactivity Disorder (ADHD) on relevancy grounds. On January 15, 2015, just before trial, the government dismissed counts 2 through 6. On January 28, 2015, the court granted Andre's motion to dismiss count 15 (involving Deborah Johnson) for insufficient evidence. JA-1147.

---

[2] "JA-___" refers to Appellants' Joint Appendix filed with this brief, which includes relevant record material, trial exhibits, transcripts, and transcript excerpts. Materials not included in the Joint Appendix are cited by exhibit or docket number, or for transcripts, original date and page number, e.g., "1/22/15(a.m.):___."

On January 29, 2015, the jury returned a verdict, convicting both Sherri and Andre on count 1, Sherri on counts 7-14, 16-18, and 20-36, and Andre on count 19 (involving Thomas Jaycox). The jury acquitted Sherri on counts 15 and 19 (involving Deborah Johnson and Thomas Jaycox), and Andre on count 22 (involving Mario Little). JA-0131-0139.

Following an April 29, 2015 hearing, the court denied both defendants' post-trial motions to set aside the verdict and for new trial. JA-0276. On July 16, 2015, the district court sentenced Sherri to concurrent terms of 48 months' imprisonment and 36 months' supervised release on all counts, a special assessment of $2,900, and restitution of $642,103, of which $37,537 was joint and several with Andre. JA-0354-0360; JA-1558-1563. The court sentenced Andre to two concurrent terms of 60 months' probation, a special assessment of $200, and restitution of $37,537. JA-0349-0353; JA-1591-1594.

Both defendants moved for a new trial pursuant to *Brady v. Maryland,* 373 U.S. 83 (1963), which the court denied on December 9, 2015. JA-1705-1723.

## 2. The Trial

### A. The Government's Evidence

Sherri Davis's tax business prepared returns for hundreds of clients each year. At trial, the government effectively cherry-picked eleven of those clients to testify,

5

each of whom generally testified that their tax returns filed between 2006 and 2013 by 2FT or DFS contained certain Schedule A or Schedule C deductions that were inaccurate and that, despite having signed their returns under penalty of perjury, they had not reviewed specific line items with their preparers in detail.[3] Some asserted Fifth Amendment rights, and testified only after the court conferred statutory immunity under 18 U.S.C. § 6002.[4] Four (Deborah Johnson, Jason Knight, Mario Little, and Leonard Durrett) admitted on cross-examination that they had claimed false charitable and Schedule C deductions on returns filed by other tax preparers.[5]

The government's cooperating witness, LaDonna Davis, testified that she moved in with her Aunt Sherri in 2004, when she was 16. JA-0778-0779. She said Andre Davis lived at home until he graduated from high school, after which he lived in Pennsylvania, where he attended college from 2007 to 2011. JA-0834-0835.

LaDonna testified that Sherri instructed her how to prepare returns, that their

---

[3] The taxpayer witnesses included Rodney Lynch, 1/20/15(a.m.):65-106; Thomas Williams, 1/20/15(p.m.):117-28; 1/21/15(a.m.):13-39; Dwendolyn Hart-Walk, 1/21/15(a.m.):41-64, 72-92; Thomas Jaycox, JA-0958-1089; Mario Little, 1/22/15(a.m.):90-141; Anthony Harris, 1/22/15(p.m.): 18-53; Deborah Johnson, 1/26/15(a.m.):14-94; Tijuana Demery, 1/26/15(a.m.):130-154; Jason Knight, 1/26/15(a.m.):154-86; Leonard Durrett, 1/26/15(a.m.):188-208; and Laurence Madison, 1/26/15(a.m.):211-234.

[4] The government initially contended "that it is our position that [the taxpayer witnesses] do not have a Fifth Amendment issue" and therefore did not require immunity, JA-0745, but on the court's recommendation, it ultimately relented.

[5] See 1/22/16(a.m.):122-125; 1/26/15(a.m.):32-45, 55-58, 163-66, 176-78.

goal was to help clients obtain large refunds, and that she helped clients claim false charitable deductions on schedule A's and false business expenses on Schedule C's. JA-0780-0781.  She also said that after she had concluded that one client owed money to the IRS, Sherri added claims to the return so that the client no longer owed money, and that after she entered business expenses for clients reflecting the total mileage on their vehicles, Sherri instructed her to enter mileage for the year instead. JA-0789-0790.  According to LaDonna, either she or Sherri assigned values, typically $5,000 or $9,000, to blank charitable receipts, or ones provided by clients for donated goods. JA-0780-0781; JA-0794; JA-0861.  2FT charged clients $99 for a paper return and up to $250-500 for electronic ones, which clients paid by cash, check, or electronic deductions from their refunds.  JA-0798.

Ladonna provided the only live witness testimony implicating Sherri in the conspiracy. The prosecution introduced documentary evidence that Sherri, after being notified that her clients' Schedule C's had triggered audits, notified some of the participating banks that were poised to terminate her participation in the program, that her company would not be filing future returns with schedule C forms.

In April, 2011, LaDonna was at the Davis home when IRS agents executed a search warrant there.  LaDonna testified that she called Sherri in Las Vegas, who told LaDonna to tell the agents that she had learned how to prepare taxes on her

7

own, that LaDonna should get herself committed so that they would think she was crazy, and "that it was just like a movie, that it was just going to go away." JA-0782-0783. At that time, four other individuals worked for 2FT, but only LaDonna and Sherri prepared returns. JA-0783-0784. One of those employees, Dwendolyn Hart-Walk testified that she left 2FT shortly after she questioned LaDonna's tax-preparation decisions, and LaDonna responded that she knew what she was doing. 1/21/15(a.m.):47-48. Returns bearing LaDonna or Sherri's electronic signature did not necessarily reflect the individual who completed that return. JA-0863.

Sherri's trial counsel pursued a standard "reasonable doubt" case-in-chief defense, as opposed to directly blaming LaDonna. The defense sought to impeach LaDonna as a typical cooperating witness and further called several negative character witnesses, but stopped short of overtly alleging that Ladonna was the leader and mastermind of the tax fraud scheme while Sherri was simply the inattentive figurehead.

After the warrant was executed, LaDonna stopped preparing returns and moved out of Sherri's house. JA-0840. She later learned that Andre planned to work with his mother, and testified that she told him he should not get involved, and that he responded that it was not a big deal, and would go away. JA-0785.

On October 4, 2011, LaDonna entered a guilty plea. She understood that,

8

unless she cooperated with the government, her sentencing guidelines range would be 57-71 months. JA-0815. LaDonna was "unsure" when asked whether she had told Sherrill Robinson, who had employed her after she left 2FT, that she "can't do no eight years." JA-0818-0819.

On October 31, 2011, the IRS expelled Sherri from its e-file program, and revoked 2FT's EFINs. 1/22/15(p.m.):67-68; Exhibit 1.84. On March 1, 2012, the IRS approved an application for an EFIN filed on February 13 by Davis Financial Services, listing Andre Davis as primary contact. 1/22/15(p.m.):62-64; JA-0627-0629. That EFIN, ending in "0647," was first used by both Andre and Sherri in early 2013, to file 2012 tax returns. *E.g.* JA-1123.

James R. Hubbs, Jr., testified for Drake Software, a tax preparation software company, regarding tax preparation fees for two different EFINs deposited for tax-years 2006-09 to a Bank of America account ending in the numbers "8252." 1/20/15(p.m.):97-114. Christopher Manuel testified regarding Taxwise software, used by both 2FT and DFS. He explained that Taxwise routed 2FT preparer fees paid for the tax-years 2008-2010 to an account ending in "8252," and DFS preparer fees for 2012 and 2013 to an account ending in "6017," describing Exhibits 5.2 and 5.4. He also described Exhibits 5.3, listing $134,256.65 paid for 2008, $158,554.82 for 2009, and $69,439.05 for 2010, and 5.5, listing $16,224 for 2012, and $7,829.95

9

for 2013.  JA-0630-0631; JA-0880-0887.

The government introduced evidence that tax preparation fees were electronically deposited into bank accounts controlled by Sherri.  This, along with documentary evidence of Sherri's individual returns, constituted the entirety of the evidence concerning Sherri's alleged false personal tax return counts.  The government further contended this evidence proved her requisite criminal intent.

## B. Closing Arguments

At the close of its rebuttal argument, the government implored the jury: "Sherri Davis is not going to stop until somebody tells her to stop.  Your job is to tell her to stop."  JA-1309.  When the rebuttal argument concluded, defense counsel requested a curative jury instruction, claiming that the government's concluding comment was improper and inflammatory.  The government made no effort to argue that its final comment was appropriate.  The court found the comment improper, and instructed the jury to disregard the comment.  JA-1311-1314.  Sherri filed a timely post-verdict Fed. R. Crim. P. 33 motion for a new trial based on the improper closing argument, claiming it was unduly inflammatory and encouraged the jury to convict based on considerations other than the evidence and that the curative instruction was inadequate to satisfy Sherri's right to a fair trial.  The court denied the motion.  JA-0140-0171; JA-0276.

10

With regard to Andre, contrary to the evidence, the government argued in closing that DFS tax preparer fees were deposited into Andre's bank account, that Andre instructed Taxwise to send those fees to that account, and that he and Sherri "made money" in 2013. JA-1212; JA-1292-1293; JA-1302. In addition, the government mischaracterized other evidence, including LaDonna's testimony, contending that Andre's knowledge of illegal activity was shown because he told LaDonna he "kn[ew] what [he] was doing" when instead, he said that "it" would "go away." JA-1220; JA-1228-1229; JA-1302.

### 3. Motions for Judgment of Acquittal, New Trial and to Set Aside Verdict

Andre moved for a judgment of acquittal after the government's case-in-chief and after the defense closed, arguing that the evidence was insufficient to convict him. JA-1116-1122; 1/27/15:172-78. The court granted that motion only as to count 15, involving Deborah Johnson's 2012 return. JA-1147. In addition to Sherri's motion for new trial noted above, Andre filed a post-trial motion to set aside the verdict, JA-0172-0216, which the court denied after a hearing held on April 29, 2015. JA-0276.

### 4. Sentencing Proceedings

At the sentencing hearing held on July 16, 2015, over defendants' objections,

11

the court attributed loss of $1,442,050 to Sherri and $27,537 to Andre.  JA-1520; JA-1523.  Counsel challenged the sufficiency and reliability of the government's summary evidence and witnesses, claiming loss amounts from hundreds of taxpayers who did not testify, and in some cases, were not even interviewed by revenue authorities.  JA-0336-0339; JA-0316-0321; JA-1422-1425.

In addition to concurrent terms of 48 months' imprisonment on all counts, the court sentenced Sherri to restitution of $642,103 for loss to the IRS, of which $37,537 was joint and several with Andre.  JA-1559-1560.  The court sentenced Andre to restitution of $37,537.  JA-1591.

### 5. The *Brady* Motions

At the July 16, 2015 sentencing hearing, after the government's IRS witness testified that LaDonna had admitted filing false personal returns from 2006-2010, defense counsel requested disclosure of that information under *Brady*.  JA-1448-1451.  The specifics of Ladonna's undisclosed statement, an oral admission that she had knowingly claimed false dependents, were set forth in more detail in a letter from the prosecutors, dated July 22, 2015, and exposed a significant inconsistency with her earlier statement memorialized in her Memorandum of Interview ("MOI").  JA-0410-0418.  On August 19, 2015, Sherri moved for a new trial based on *Brady* and Andre joined and adopted that motion.  JA-0362-0430; JA-0513-0514; JA-0559.

12

Sherri contended that the previously undisclosed material was both critical non-cumulative impeachment material and substantive exculpatory evidence that would have radically changed the manner in which she conducted her defense. Specifically, she contended she would have attacked Ladonna as the criminal mastermind behind the tax fraud scheme and would have testified. In denying Andre's *Brady* motion, the court cited evidence of bank records never admitted at trial. After hearings held on September 14 and December 9, 2015, the court found that two of the *Brady* requirements were met but that omission of the evidence did not prejudice either defendant. JA-1705-1723.

Both defendants appealed their convictions and sentences and the court's denial of their *Brady* motions. JA-0348; JA-0361; JA-0625-0626.

## SUMMARY OF ARGUMENT

The evidence did not prove beyond a reasonable doubt that Andre Davis conspired with his mother to file false returns or that he aided and assisted in filing Thomas Jaycox's false 2012 tax return. Jaycox did not know Andre, and identified him during in direct and cross-examination based only on the electronic signature listed on his 2012 return. On redirect, Jaycox corrected his initial testimony, testifying that he did *not* recall Andre having assisted in preparing his return. Instead, an unidentified young man had entered the *initial* portion of the return. He

13

did not testify that the young man discussed with him or entered false deductions. Sherri Davis always finalized Jaycox's returns, including in 2012. No other evidence, including DFS's EFIN application, LaDonna's conversation with Andre, and Taxwise records regarding preparer fees, demonstrated that Andre conspired with or knowingly agreed to join his mother in unlawfully filing false returns. Accordingly, this Court should reverse and vacate both of Andre's convictions.

Sherri's convictions should be reversed based on the *Brady* violation. At sentencing, the government disclosed that it had failed to produce a statement by the government's key cooperating witness, LaDonna. In that statement, Ladonna admitted to multiple federal tax felonies regarding her 2006-2010 personal tax returns, where she knowingly claimed false dependents. This information was both compelling impeachment material and also possessed independent exculpatory value as it demonstrated that the government's main cooperating witness had the independent knowledge and intent to concoct her own tax fraud scheme. This, in turn, could have supported an entirely different substantive defense that Ladonna was the "mastermind" behind the charged scheme. The district court erred by not finding the *Brady* material sufficiently prejudicial to warrant reversal of any of the convictions. This Court, reviewing de novo, should conclude that the government's failure to disclose the *Brady* material undermined the outcome and the result at trial,

14

requiring reversal of all counts.

The district court denied Andre's *Brady* motion based on clearly erroneous factual findings, having accepted the government's incorrect argument that Andre received preparer fees in connection with fraudulent returns. Contrary to those findings, no trial evidence showed that Andre received any DFS preparer fees, much less fees associated with specific fraudulent returns. As a result of the factual errors, if this Court does not reverse for insufficiency, it should reverse Andre's convictions and order a new trial.

Next, Sherri's convictions should be reversed because the trial court committed reversible error when it granted the government's pre-trial motion to exclude Sherri's proposed expert testimony that she suffers from ADHD. The proffered expert testimony was relevant as to whether she possessed the requisite specific intent. The trial court incorrectly determined that the testimony was irrelevant, and that, even if relevant, the evidence was inadmissible because it was too confusing for the jury. This was straightforward evidence and there was no realistic probability that the jury would mistakenly utilize the evidence to "excuse" criminal conduct rather than to evaluate whether the government sufficiently established that Sherri possessed the requisite criminal intent.

The trial court also committed reversible error when it denied Sherri's motion

15

for a new trial based on the government's improper and extremely prejudicial comments in closing rebuttal argument imploring the jury to convict because Sherri was going to continue to commit tax crimes unless told to stop—and that it was the "[jury's] job ...to tell her to stop." This exhortation to convict in order to stop hypothetical future criminal conduct denied Sherri a fair trial. The limiting instruction was insufficient to cure the resulting substantial unfair prejudice.

Also during closing argument, the government misrepresented the evidence against Andre, claiming that he directed Taxwise to deposit all proceeds in 2013 for the 2012 tax year into his personal bank account, that he "made money," and that the jury would "see the bank account that Andre Davis asked Taxwise to send those fees to." The government introduced no evidence of Andre's personal bank records and no evidence of who instructed Taxwise regarding preparer fees. The district court plainly erred in failing to correct these and other government misrepresentations of evidence, including one involving LaDonna's conversation with Andre, in closing argument.

If this Court does not reverse defendants' convictions, it should remand for resentencing. The district court plainly erred in assigning $27,537 in loss to Andre at sentencing while applying a guidelines base offense level of 14 applicable to losses over $30,000. For both appellants, the court improperly calculated the

16

amount of loss, relying on cryptic documentary evidence in support of loss and restitution, which even the government's sponsoring witnesses could not fully decipher at the hearing. The court failed to make required, disputed factual findings, including those involving acquitted conduct and those unsupported by the government's sentencing evidence, failed to explain why Andre was responsible for loss resulting from Sherri's personal tax returns, and erred in concluding that loss could be estimated without precision, when this case did not involve estimating loss. Similarly, the court failed to make or clearly erred in making required factual findings in support of restitution.

Lastly, as to any remaining counts of conviction, Sherri's case should be remanded for a full hearing to determine whether her trial counsel provided constitutionally adequate representation. Sherri raises colorable claims concerning trial counsel's failure to promptly move for a mistrial, and counsel's inexplicable failure to introduce several pieces of compelling defense favorable evidence.

## ARGUMENT

### I.   THE GOVERNMENT'S EVIDENCE AGAINST ANDRE DAVIS WAS INSUFFICIENT

#### A. Standard of Review

This Court decides a claim that evidence is insufficient based on "whether,

17

after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the necessary elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

### B. No Rational Jury Could Convict Andre Davis of Aiding in Filing a False 2012 Return for Thomas Jaycox

The evidence was insufficient to convict Andre Davis on count 19, aiding and assisting in the filing of Thomas Jaycox's 2012 return. Thomas Jaycox did not identify Andre. Read in its entirety, his testimony made clear that he did not even know Andre. When initially asked if he knew who Andre was, Jaycox answered: "I do now." JA-0959-0969. He identified Sherri Davis—and not Andre—in open court. JA-0959. Jaycox explained that his testimony that Andre prepared his taxes one year, *see* JA-0960; JA-0992; JA-1044, was based on reviewing the electronic signature on his return after the fact. JA-1052-1053. On redirect, Jaycox stated that he did *not* recall Andre having assisted him, or having entered numbers into a computer to prepare his return; instead, he recalled "a young man" having entered initial information. JA-1078; JA-1084. He confirmed that it was "fair to say that [he] wouldn't know Andre Davis if [he] bumped into him on the street." JA-1078.

Furthermore, Jaycox did not suggest that the young man recorded or discussed

18

with him Schedule C deductions, charitable donations, or any false information.  On cross-examination, Jaycox said he "went through everything" with Andre, but Sherri still finalized the returns.  JA-1046.  On redirect he clarified that "[t]he *initial* portion of [his return] was taken care of by the young man, and then later Sherri came in and *finished everything else* out."  JA-1079 (emphasis added).  "The way the process went every year, Sherri would finalize the taxes."  JA-1046.  "Every year" included 2012.  *Id.*; *see also* JA-1048 ("I always did meet with Sherri"); JA-1057 (if asked who did his taxes, he would have answered "Sherri").  Jaycox could not recall whether the young man or Sherri asked him to sign his return.  The young man signed the return, following which Jaycox had a discussion with Sherri, who finalized the return.  JA-1046.

Jaycox was impeached with a prior inconsistent statement made to federal agents, whom he told that Sherri had prepared his 2012 return.  JA-0635-0637; JA-1048-1052.  In a later interview, agents asked Jaycox if anyone else had helped prepare his returns, and he told them a young man had done so, but did not identify that man.  JA-1084.

The government's evidence was insufficient to convict Andre of count 19 for two independent reasons.  First, despite Jaycox's initial testimony that Andre had helped prepared one of his returns, no rational jury could conclude beyond a

19

reasonable doubt that the individual who did so was Andre, given Jaycox's failure to identify Andre in open court, his clarification that his testimony had been based on Andre's typewritten name on the 2012 return, his correction that instead, a young man who he could not identify had assisted with his return, and his admission that he could not identify Andre. *See e.g, United States v. Castle*, 2016 WL 3254307, at *12 (D.C. Cir. June 14, 2016) (in suppression ruling, not reasonable to infer defendant acted to evade police, despite officer's testimony that "'they made us out'" and "'I think they knew we were the police,'" given officer's clarification that statement was based on his belief unmarked vehicle was known in community as police vehicle). The young man to whom Jaycox referred could have been another DFS employee, Adam Russell, described by another taxpayer as having been "at the table over the computer" entering numbers into the taxpayer's 2012 return, 1/22/15(a.m.):96-98, or an entirely unidentified person. *See also* JA-1396; JA-1399 (government representation in opposition to Andre's post-trial motion to set aside verdict that "defense counsel has proven that Andre Davis was not identified by Thomas Jaycox, he's correct," and that it was "not relying on identification, because Thomas Jaycox could not identify Andre Davis").

Second, no rational jury could conclude beyond a reasonable doubt that the "initial" information the young man entered included anything other than accurate

20

information, such as Jaycox's W2 earnings.  No trial evidence suggested that the young man discussed with Jaycox or had knowledge of false information or inflated deductions.  Jaycox clearly testified that Sherri finalized his 2012 return.    Proof of willful intent under § 7206(2) required a showing that the defendant was a "purposeful tax violator," *United States v. Bishop*, 412 U.S. 346, 361 (1973); *see also Rosemond v. United States*, 134 S. Ct. 1240, 1248-49 (2014) (aiding and abetting "'satisfied when a person actively participates in a criminal venture with full knowledge of the circumstances constituting the charged offense'") (citation omitted), which Jaycox's testimony failed to demonstrate.    Accordingly, the evidence was insufficient to convict Andre of aiding or assisting in the filing of a false 2012 return for Jaycox.

Andre's electronic signature on Jaycox's 2012 return did not otherwise provide a basis for conviction on count 19.  Nor did it demonstrate his responsibility for false deductions, especially given (1) Jaycox's express testimony that Sherri finalized that return; and (2) record evidence demonstrating that the Davis's used electronic signatures interchangeably.  JA-0863 (LaDonna Davis: "Q. What would happen if you were logged into the system and Sherri would come in and complete a return? A. It would come in under my name.  Q. And did that happen at times?  A. Sometimes, yes."); 1/27/15:164 (government argument, agreed to by defense, that

21

"if one person was logged in and someone else continued on, their name could appear when in fact it was someone else who prepared it"); *see also* JA-0913-0914 (Taxwise software was "multi-user" and lacked login requirement); JA-0916-0917 (software allowed use of other users' names); JA-1123 (government argument that "the EFINs that Andre Davis applied for are being used by Sherri Davis and Andre Davis"). *See, e.g. United States v. Gaskins*, 690 F.3d 569, 578-79 (D.C. Cir. 2012). (evidence insufficient to show knowing participation in conspiracy despite defendant's name on lease for apartment and utility bills where drugs were found).

Therefore, the evidence against Andre on count 19 was insufficient and this Court should reverse his conviction.

## C.  No Rational Jury Could Convict Andre Davis of Conspiracy

The evidence was also insufficient to convict Andre of count 1, conspiring with his mother to file false tax returns. That showing was not made by Jaycox's testimony as explained above, nor was it made by DFS's EFIN application, the LaDonna conversation, or Taxwise records. To convict for conspiracy, the jury was required to find that Andre knowingly and intentionally joined in an agreement to further the conspiracy's object, that the object was illegal, and that he had a common understanding to violate the law. JA-1184-1185.

The EFIN application for DFS submitted in Andre's name contained no

22

handwritten signature and did not show that Andre personally submitted that application. JA-0627-0629. As the district court recognized, Sherri "could have [submitted the EFIN application] using [Andre's] information." JA-1126; *see also* JA-1212; JA-1230 (government acknowledgement that Sherri also used DFS's EFIN number). Even if the jury could presume that Andre approved the EFIN application, no evidence suggested that he did so with anything other than the intent to file accurate returns, or that he did so as part of an agreement to assist in preparing false returns. As the government recognized in closing argument: "Maybe Sherri Davis and Andre Davis normally prepared accurate returns, but the people that you saw today [i.e., taxpayer witnesses] were the only people in the world who had false returns prepared." 1/27/15:169.[6]

LaDonna's testimony about a conversation with Andre also did not establish a conspiracy between Sherri and Andre. LaDonna claimed to have told Andre "he shouldn't get involved" in working with his mother "because of everything else that was going on." She said Andre responded "that it wasn't a big deal, and that it was just going to go away." JA-0785. Even if jurors could interpret "everything else" as

---

[6] The jury acquitted Andre of aiding and assisting in the filing of Mario Little's 2012 return, after asking: "The fact that Andre's EFIN was used in Mario Little—is that enough to count as 'willful' act per counts of aiding and assisting?" The court denied defense counsel's request to answer "no" and responded by directing the jury to instructions on the elements of the aiding and assisting count and willfulness. JA-1331-1335.

23

the IRS investigation, the conversation fails to reveal Andre's knowledge of illegal conduct by his mother. LaDonna's testimony about Andre's response mirrored one she attributed independently to Sherri, that "it was just going to go away," JA-0783; JA-0806, which LaDonna also testified "everybody [in the family] kept saying." JA-0852. At most, the jury could have concluded that Andre had learned from his mother that "it" would "go away" and believed her, understanding her business to be legitimate, and demonstrating his confidence in his her innocence. Jurors could not have reasonably concluded from LaDonna's testimony that Andre had agreed with his mother to file false returns.

The documentary evidence did not otherwise establish Andre's participation in a conspiracy. No trial evidence showed bank accounts in Andre's name or Andre's receipt of preparer fees in connection with Jaycox's 2012 return or any other returns. The government's only evidence listing Andre in connection with DFS proceeds was Exhibit 5.4, a three-row, twelve-column, Taxwise summary prepared for trial in response to a government subpoena. JA-0630; JA-0911-0912. That exhibit listed two rows for 2012 and one for 2013, with columns for banks (TPG and Republic), office (DFS), name (Andre Davis), address, routing number, and account number (ending in "6017"). JA-0630. The fact that Taxwise listed Andre's name on that exhibit reflects no more than Andre's status as Taxwise's

24

primary contact for DFS—Taxwise's only customer for either Davis in 2012. Exhibit 5.4 does not quantify fees and does not reveal who instructed Taxwise where to deposit DFS fees. Nor does it show that Andre had any interest in or control over TPG or Republic bank accounts or any account ending in "6017." No other Taxwise exhibit listed bank information or demonstrated that Andre received or directed the payment of preparer fees.[7] Thus no evidence established that Andre received payment for the filing of any fraudulent returns or, indeed, for any work completed by DFS.

At most, evidence showed that someone used Andre's typewritten name in connection with DFS and his preparer ID on certain returns. As the government explained to the jury, exhibits "15.8 and 7" [likely 5.7 and 5.8, or 5.18] listed hundreds of taxpayers "who did not have false returns prepared" and the majority of returns filed by DFS may have been accurate. JA-1300-1301. Even viewed in the light most favorable to the government, the evidence did not show that Andre knew of any tax fraud or agreed with Sherri to commit such fraud.

> Without the knowledge, the intent cannot exist. Furthermore, to establish the intent, the evidence of

---

[7] Government Exhibit 5.5 summarized total fees paid to DFS for the 2012 and 2013 tax-years without identifying to whom or into what accounts those fees were paid. JA-0631. Exhibits 5.8 and 5.18 listed specific DFS clients for whom Taxwise processed returns and deducted preparer fees from refunds, with no listing of the account into which those preparer fees were paid.

> knowledge must be clear, not equivocal. This, because
> charges of conspiracy are not to be made out by piling
> inference upon inference, thus fashioning . . . a dragnet to
> draw in all substantive crimes.

*Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943) (citations omitted); *see also Ingram v. United States*, 360 U.S. 672, 679-80 (1959) (circumstantial evidence of intent involving local crime insufficient to show intent to violate federal tax law); *United States v. Salerno*, 902 F.2d 1429, 1432-34 (9th Cir. 1990) (insufficient evidence that participants in scheme to defraud casino intended to evade taxes); *United States v. Krasovich*, 819 F.2d 253, 256 (9th Cir. 1987) (reversing § 371 conspiracy for insufficient evidence of defendant's knowledge of illegal objective to evade taxes).

The verdict may be explained by (1) the government's mischaracterization of evidence during closing argument, especially its claim that Andre personally received payment for false returns, as explained below; (2) the omission of exculpatory *Brady* evidence with which counsel could have effectively impeached LaDonna, as also explained below; and (3) the introduction of prejudicial testimony from Anthony Harris regarding Andre, which the court later ordered be stricken from the record. 1/22/15(p.m.):30-31; 1/26/15:127; 1/27/15:144-45.

In addition, the verdict may be explained by the unfair advantage the

government gained by failing to elicit Jaycox's redirect testimony during his direct examination.  Jaycox's initial testimony left the jury with an inaccurate initial view that Jaycox knew and could identify Andre, which was not cured by Jaycox's redirect, by which time it was too late to correct the jury's misimpression. On direct, the government highlighted that misimpression, expressly asking whether Andre had worked on Jaycox's return at Sherri's house, how many times Andre had done so, and whether Jaycox told Andre he had certain charitable contributions, JA-0960-0961; JA-0974-0975; JA-0992, waiting until redirect to elicit testimony that Jaycox could not identify Andre, that instead a "young man" had prepared his taxes, and that the young man had initialized but not finalized his return.  The government also exploited the jury's initial view in closing argument.[8]  JA-1396; JA-1399; *see also Napue v. Illinois*, 360 U.S. 264, 269 (1959) (government obligation not to mislead jury); *United States v. Straker*, 800 F.3d 570, 603-04 (D.C. Cir. 2015) (essentially same), *cert. denied*, 136 U.S. 1170 (2016).   Had Jaycox's redirect testimony occurred instead on direct, the jury might have acquitted Andre on count 19.

---

[8] In closing argument, the government told the jury Jaycox testified that Andre did his taxes one year, that "[Andre] was there, he did my return, why would [Jaycox] lie?," and that "Thomas Jaycox said that Andre prepared it [and] that Andre Davis was there directing and/or putting information into the computer."  JA-1218-1220; *see also* JA-1293 (electronic signature corroborates Jaycox's testimony "that Andre input the information to a computer"); JA-1308 (Jaycox said "'I did sit down with Andre to do my return with him one year.'").

Even when evaluated under the heavy burden required for this Court to find insufficient evidence, *United States v. Vega*, 2016 WL 3457715, at *2 (D.C. Cir. June 24, 2016), the government failed to introduce evidence from which a reasonable jury could find beyond a reasonable doubt that Andre Davis knowingly agreed with his mother to commit unlawful conduct or that he aided and assisted in preparing a false 2012 return for Thomas Jaycox. Accordingly, the district court erred in denying Andre's motion for judgment of acquittal and his post-trial motion to set aside the verdict.

## II. SHERRI DAVIS SHOULD RECEIVE A NEW TRIAL BASED ON THE GOVERNMENT'S *BRADY* VIOLATION FOR FAILING TO TIMELY PRODUCE THE STAR COOPERATING WITNESS' PRIOR STATEMENT WHERE SHE ADMITTED HER OWN TAX RETURNS WERE FRAUDULENT

### A. Standard of Review

Assessing *Brady* violations, this Court "review[s] *de novo* the prejudice determination made by the district court, considering directly "any adverse effect that the prosecutor's failure…might have had on the preparation or presentation of the defendant's case."" *United States v. Pasha*, 797 F.3d 1122, 1133 (D.C. Cir. 2015).

### B. *Brady* Principles

A *Brady* violation has three components: ""the evidence must be favorable to

28

the accused; that evidence must have been suppressed by the prosecution either willfully or inadvertently; and prejudice must have ensued.'" *Pasha*, 797 F.3d at 1133 (citation omitted). The court determined that the first two components of the three prong *Brady* test were satisfied, JA-1651, although the government strenuously argued below that none of the prongs were established. JA-0431-0435. The only appellate issue is whether Sherri established sufficient prejudice to warrant a new trial.

Appellants need not affirmatively show that the outcome of the trial actually would have been different if the government had disclosed the exculpatory evidence earlier, or, that a different verdict is "more likely than not." *United States v. Johnson*, 592 F.3d 164, 179 (D.C. Cir. 2010). This is not a sufficiency of the evidence test. *Pasha*, 797 F.3d at 1134. Appellants need only show from the perspective of "a generic factfinder who has not already reached a determination of guilt beyond a reasonable doubt" that "there is a 'reasonable probability' that the result of the trial would have been different if the suppressed evidence had been disclosed to the defense." *Id.* at 1133-34 ("reasonable probability does not require a showing that it is more likely than not that the defendant would have been acquitted had the evidence been disclosed"). This inquiry includes "any adverse effect that the prosecutor's failure … might have had on the preparation or presentation of the

29

defendant's case," *United States v. Bagley*, 473 U.S. 667, 683 (1985), and

"accounting for how the defense may have changed its preparation or presentation if

the exculpatory evidence had been disclosed in a timely manner." *Pasha*, 797 F.3d

at 1134. In other words, had the exculpatory evidence been disclosed in a timely

manner, "the likelihood of a different result is great enough to undermine confidence

in the outcome of the trial." *Smith v. Cain*, 132 S. Ct. 627, 630 (2012).

### C. Sherri Davis Established Sufficient Prejudice to Require a New Trial on all Counts

The government failed to timely turn over LaDonna's candid oral admission,

essentially a confession, that she knowingly filed fraudulent individual tax returns

for 2006-2010 by claiming dependents that she knew, in fact, were illegitimate. JA-

0410-0411. Ladonna also indicated that Sherri prepared the 2006 return and

LaDonna prepared the others. Complicating matters, part of that statement was

inconsistent with another statement LaDonna made to law enforcement, that had

been timely produced, where she indicated that she prepared all of her 2006-2010

returns. JA-0420; JA-0427-0428, ¶¶55-56.

LaDonna's undisclosed *Brady* statement constituted a confession to felony tax

fraud with respect to her own tax returns. These acts were not charged as separate

counts or overt acts in the indictment. The conspiracy charge was expressly confined

30

to a scheme to falsify business expenses or charitable contributions utilizing Schedule A or C deductions.  JA-0038; JA-0041-0049, ¶¶12-17.

The government, on direct examination, did not question LaDonna concerning her 2006-2010 returns.  Without LaDonna's confession, the defense on cross-examination similarly asked no questions concerning those returns.  Thus, this critical line of cross-examination was not pursued.  JA-1640-1643.

This *Brady* material was powerful impeachment material that eroded the credibility of the government's star cooperating witness in a manner and degree far more powerful than any of the other impeachment evidence that had been adduced at trial.  The *Brady* statement was also inextricably intertwined or prior acts evidence to establish intent or knowledge, because it tended to establish that Ladonna possessed independent criminal ingenuity to execute her own discrete tax fraud.  This is the essence of exculpatory "reverse 404(b) evidence" that a third person committed the charged offense and directly undermines the government's theory that Sherri taught LaDonna how to prepare fraudulent tax returns.

Sherri argued that, had this information been timely disclosed, it would have led to an entirely different defense strategy that would have squarely laid the blame on LaDonna as the criminal mastermind, who possessed the ingenuity, knowledge and determination to conceive and execute the tax fraud scheme alleged in the

31

indictment. In addition, although LaDonna was subject to the routine impeachment of a cooperating witness (that was not particularly effective), this different strategy would have been far more aggressive and effective.

Thus, the withheld information was both impeaching and exculpatory. By being able to utilize LaDonna's confession of engaging in her own discrete felony tax fraud scheme outside the scope of the charged conspiracy, a more aggressive approach to challenging her credibility as well as focusing the blame on her would have sufficiently cast doubt on the reliability of the outcome of the trial. *See Kyles v. Whitley*, 514 U.S. 419, 441 (1995) (granting new trial where "essence of the State's case was the testimony of eyewitnesses" and suppressed impeachment evidence would have "substantially reduced or destroyed" the value of those witnesses).

The district court made several errors that cumulatively resulted in its incorrect finding that sufficient prejudice had not been established. *See id.* at 441 (requiring "cumulative evaluation" of the materiality of wrongfully withheld evidence). First, the trial court apparently viewed the *Brady* material essentially as impeachment material only. JA-1717-1718. Even assuming *arguendo* that this was accurate, the court grossly undervalued the substantial prejudicial effect of the evidence. Ladonna admitted to multiple federal tax felonies concerning her own

32

discrete tax fraud. This was not merely cumulative impeachment evidence. Rather, this was qualitatively and quantitatively different from her acknowledgement, as part of her plea and cooperation agreement, where she admitted to being an underling in the charged tax fraud scheme, as well as the other standard impeachment evidence concerning her general untruthfulness. *See United States v. Cuffie*, 80 F.3d 514, 517-18 (D.C. Cir. 1996) (undisclosed evidence that key government witness lied under oath in previous court proceeding not merely cumulative of other impeachment evidence and deemed material under *Brady*). Had this impeachment occurred, it would have further yielded new destructive lines of cross examination concerning LaDonna's overall veracity as well as her noncompliance with the truthtelling provisions of her cooperation agreement. JA-1697-1701. Thus, significant aspects concerning her credibility "[were] allowed to stand unchallenged." *United States v. Smith*, 77 F.3d 511, 515 (D.C. Cir. 1996).

Next, the court determined the undisclosed *Brady* material was not exculpatory because LaDonna asserted that Sherri prepared the 2006 return; therefore the statement was consistent with the government's theory that Sherri taught LaDonna how to create fraudulent tax returns. However, this is an unduly myopic view of the record.

Defense counsel had been timely provided with LaDonna's Memorandum of

33

Interview ("MOI"), summarizing an April 11, 2011 debriefing session. There, LaDonna stated that "in 2006" her tax return was prepared by Jackson Hewitt, but *she* had prepared her personal returns for 2006, 2007 and 2008. She also indicated that all of these returns were accurate. JA-0427-0428, ¶¶ 55-56. This was clearly inconsistent with the undisclosed *Brady* statement.[9]

Had the *Brady* material been timely disclosed, this would have created a treasure trove of powerful impeachment material *and* substantive exculpatory evidence. Under skilled cross-examination, the *Brady* statement and the MOI may have yielded LaDonna's acknowledgement of the truthfulness of all or parts of the earlier statements. Alternatively, depending on Ladonna's response, the earlier out-of-court statements may have been admissible as substantive evidence. Fed. R. Evid. 807; *see also Chambers v. Mississippi,* 410 U.S. 284 (1973) (discussing due process principles requiring admission of defense evidence).

Then, the jury would have sorted through the thicket of her inconsistent statements, now admissible for impeachment and as substantive evidence, concerning who prepared her 2006 return and whether she believed the dependent information on the subject returns was accurate. Instructively, LaDonna's trial testimony was devoid of any evidence that Sherri taught her to inflate refunds by

---

[9]  It also constituted several 18 U.S.C. § 1001 federal felonies.

falsifying dependents. JA-0780; JA-0795; JA-0805. Thus, at least one juror could have had a reasonable doubt of Sherri's guilt by determining that, as per Ladonna's confession and other evidence where she admitted she prepared all of her 2006-2010 returns, LaDonna possessed the requisite skill and knowledge to devise her own criminal tax fraud scheme utilizing false dependents. At least one juror could have also further possessed a reasonable doubt whether Sherri prepared the 2006 return.[10] Accepting only parts of a witness' statement adheres to the court's instructions.[11] Thus, the district court erred by concluding the materiality prong was not satisfied largely because "it is certainly arguable [Sherri] prepared the first one and showed LaDonna … how to do it and she did the rest." JA-1713. *See Wearry v. Cain*, 136 S. Ct. 1002, 1007 (2016) (reversing lower court finding of no *Brady* violation where post-conviction court had improperly emphasized reasons a juror might disregard new evidence while ignoring reasons she might not").

The undisclosed impeachment/exculpatory material could have undermined LaDonna's entire testimony and thus satisfies the *Brady* "prejudice" prong. Several

---

[10]    LaDonna testified that "sometimes" the tax software indicated that the person whose login code was used prepared a particular return when someone else actually completed that return. JA-0863.

[11]    The court earlier instructed the jury that "[y]ou must decide the extent to which you believe any witness." 1/20/15(a.m.):33. Prior to closing argument the court further instructed jurors to "give the testimony of each witness such weight, in your judgment, it's fairly entitled to receive." JA-1172.

35

times, the government acknowledged LaDonna's credibility as essential to establish

proof of the conspiracy and Sherri's requisite intent. For example, at a judgment of

acquittal hearing, the following colloquy occurred:

> THE COURT: What evidence did you have of [Sherri's] willfulness, the lady who was a friend who worked there for a while, what are you relying upon she actually did these things knowing they were wrong?
>
> [THE PROSECUTION] Yes, Your Honor. … One, we would say the testimony of LaDonna Davis, your honor, that she taught LaDonna Davis that we're going to get all of the refund—all of the withholding back, that was the goal, and we were going to do that. We were going to put stuff on the schedule A and we were going to put stuff on the Schedule C that is not accurate. So we're going to give them a business. We're going to give them charitable deductions, even if they didn't indicate the amounts indicated.

JA-1112.[12]

If this testimony was disbelieved, the prosecution could not prevail, regardless

of the strength of the other evidence against Sherri. The Supreme Court has

recognized the right of effective cross-examination is "critical to a fair trial because

cross-examination is the principal means by which the believability of a witness and

the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 318 (1974).

In *United States v. Kohring*, 637 F.3d 895 (9th Cir. 2011), the Ninth Circuit

---

[12]    The government made a similar acknowledgement at the *Brady* hearing. JA-1633-1634.

36

found a *Brady* violation where the prosecution failed to disclose key impeachment

evidence of the prosecution's star witness:

> The alleged misconduct [*Brady* violation impeachment evidence] would have added an entirely new dimension to the jury's assessment of Allen.    Allen was "the prosecution's star witness" … As we have previously held, 'Impeachment evidence is especially likely to be material when it impugns the testimony of a witness who is critical to the prosecution's case."    Indeed, had the evidence of Allen's past conduct been disclosed, "*there is a reasonable probability that the withheld evidence would have altered at least one juror's assessment*" regarding Allen's testimony against [the defendant].

*Kohring*, 637 F.3d at 905-06 (emphasis added) (citing *Cone v. Bell*, 556 U.S. 449,

475 (2009) (similarly noting that the suppressed evidence "might have persuaded

one or more jurors").    Such is the circumstance here.    A reasonable probability exists

that at least one juror, when confronted with the entirety of LaDonna's duplicity,

would have been sufficiently doubtful of her veracity so as to likely vote not guilty

on every count.

Second, the trial court seemed to improperly minimize the importance of the

impeachment evidence and also apparently rejected any suggestion that the *Brady*

material possessed any exculpatory value. JA-1708; JA-1717. The court essentially

determined that because some aspects of the charged conspiracy and a few

substantive counts concerned tax preparation activity that took place after LaDonna

37

left the conspiracy, including a few counts concerning Sherri's own returns based on allegedly understated taxable income, there was no prejudice. JA-1688; JA-1717-1718.

Additionally, the trial court intimated that a prejudicial spillover analysis could never be utilized. This was error. A type of spillover unfair prejudice analysis for a *Brady* violation is appropriate, and can support a reversal of some counts even if those counts are not directly linearly related to the violation, but raise serious questions concerning the integrity of the verdict nonetheless.

For example, in *Wolfe v. Clarke*, 691 F.3d 410 (4th Cir. 2012), the Fourth Circuit upheld a *Brady* violation for failure to disclose a police report that directly impacted and led to the reversal of convictions for murder and for the use of a firearm in the commission of a felony. The Fourth Circuit also upheld the reversal of Wolfe's conspiracy to distribute marijuana conviction, where the evidence supporting that count was, in prosecution words, "unaffected by the suppression of any *Brady* material." *Id.* at 425.

The Court noted that, although the undisclosed *Brady* material did not directly affect the marijuana conspiracy conviction, most of the evidence to support that conviction came from the defendant's own testimony. It further held that the Commonwealth "cannot prove that Wolfe would have testified if the Newsome

38

report had not been suppressed [by the prosecution]." *Id.* at 425-26. Therefore, a type of spillover prejudice had indirectly but fatally infected the marijuana conspiracy count.

Moreover, in *United States v. Oruche,* 484 F.3d 590 (D.C. Cir. 2007), this Court implicitly acknowledged the propriety of a prejudicial spillover analysis for *Brady* claims in limited circumstances. Though the Court rejected a *Brady* prejudicial spillover argument on the merits, holding that the "relationship between the various counts were not so great that the convictions on [the counts not directly affected] are placed in doubt simply because testimony on other counts in challenged," *Oruche,* 484 F.3d at 597, it did not suggest that, for *Brady* claims, a prejudicial spillover analysis was inapplicable as a matter of law. Here, in contrast, the credibility concerns of the government's indispensible cooperating witness puts every count of conviction into doubt.

The district court noted that in this Circuit "*Brady* factors must be assessed count by count of *Brady* violation [sic] with respect to the defendant's conviction on one count does not necessarily affect the conviction of other counts." JA-1707-1708. That language appears in *Johnson,* 592 F.3d at 171, which concerned a *Brady* error that resulted in a reversal of the conviction. *Johnson* does not categorically rule out application of a prejudicial spillover analysis—as illustrated by the

39

phraseology "does not *necessarily* affect." *Id.* (emphasis added)

Nor does *Pasha* prohibit application of a prejudicial spillover analysis. In *Pasha*, this Court reversed Daaiyah Pasha's conviction for a *Brady* violation but did not reverse her daughter's conviction because the specific *Brady* error concerned exculpatory eye witness identification evidence as the mother but not the daughter—the prejudicial spillover effect of the key government witness's credibility was not at issue. *Pasha,* 793 F.3d at 1133-38.

A *Brady* prejudice analysis is inherently fact specific and the Court must broadly assess the likely cumulative effect of the omitted evidence, instead of taking a hyper-technical narrow view of whether the evidence was prejudicial in isolation. This is consistent with the Supreme Court's most recent explication of the issue. *Wearry*, 136 S. Ct. at 1007 (materiality must be viewed cumulatively).

As noted above, the crux of Sherri's argument was that LaDonna's impeachment would have been quantitatively and qualitatively stronger, and an entirely different legal strategy would have been undertaken, including the possibility that Sherri would have taken the stand. Moreover, the *Brady* prejudice analysis also considers the strength of the government's case in evaluating whether the confidence in the verdict has been undermined. *See Oruche*, 484 F.3d at 597-601. The manner in which the government disclaimed its own trial theory during

40

post-trial motions litigation reveals the general weakness of the prosecution's case.[13]

Whether a species of "prejudicial spillover" can be successfully applied depends, in part, on whether "the elimination of the invalid count [would have] significantly changed the strategy of the trial." *United States v. Wright*, 665 F.3d 560, 575 (3d Cir. 2012). Here, the strength of the conspiracy count would likely have been wholly gutted had the jury been presented with an invigorated defense theory utilizing the undisclosed *Brady* material as both *additional* powerful impeachment evidence and as either Rule 404(b) or "inextricably intertwined" evidence relevant to establish LaDonna's criminal intent or knowledge. Here, it is likely that, with the omitted evidence considered, at least one juror might have had a reasonable doubt concerning LaDonna's veracity, thus calling into question the validity of all of Sherri's convictions. Surely "there is a reasonable probability that the withheld evidence would have altered at least one juror's assessment" regarding the veracity of LaDonna's testimony. *See Kohring*, 637 F.3d at 906. This clearly undermines confidence in the conspiracy verdict even acknowledging the handful of straggler overt acts that allegedly took place after LaDonna left the conspiracy.

The same holds true for the few substantive counts alleging conduct occurring after LaDonna left the conspiracy. First, with respect to the counts concerning

---

[13]    *See* note 22 *infra* (discussion of government changing its theory of case in litigating opposition to Motions for New Trial).

41

Sherri's own tax returns, if the lion's share of tax fraud counts is infirm based on the *Brady* violation, the nature of how to defend these remaining counts substantially changes. The cost-benefit analysis of whether Sherri would testify (for example, whether to testify and explain what good faith calculations were utilized to arrive at the figures in the returns) would drastically change. Moreover, defending against a tax crime based on underreporting one's own taxable income is distinct from the tax preparer fraud charges that were the gravamen of the indictment. The fact that these counts concern tax filings occurring after Ladonna left the conspiracy does not preclude the *Brady* prejudice analysis.

However, the trial court totally rejected Sherri's assertion that she would have testified. The government should have the burden of establishing that Sherri would not have testified even if the *Brady* violation had not occurred. *See United States v. Pelullo*, 105 F.3d 117, 125 (3d Cir. 1997) (discussing analogous obverse situation where *Brady* violation induced defendant to testify at first trial, burden on prosecution to establish that defendant would have testified anyway even if there had been no constitutional violation).

Here, the government made no effort to meet this burden. The court nonetheless concluded that it "strained credibility" that Sherri would have testified because she would have been subject to cross-examination that many of the

42

government taxpayer witnesses provided inculpatory evidence.   JA-1716.   This rationale buttressed the trial court's conclusion that sufficient prejudice had not been established.

The district court's conclusion is unsupportable.   Every taxpayer witness acknowledged they signed the completed returns under penalty of perjury, so their inculpatory testimony against Sherri, provided with the knowledge that they were effectively immune from any criminal consequences, was not beyond all reproach. Moreover, at least two of those taxpayers whose returns were prepared after LaDonna left the conspiracy had previously filed tax returns prepared by someone other than Sherri or Andre that contained similar questionable information.  Surely, with the additional powerful impeachment and criminal knowledge/intent evidence of LaDonna, at least one juror may well have had a sufficiently jaundiced view of the government's case, LaDonna's credibility, and whether the government had established guilt beyond a reasonable doubt on all counts.

The trial court recognized that this issue was destined for appellate resolution. JA-1667.  Sherri articulated a plausible defense theory that would have been pursued had the government made a timely *Brady* disclosure.   The further erosion of LaDonna's credibility based on the *Brady* violation clearly undermines confidence in the verdict on all counts.   Additionally, the court failed to recognize that the

43

*Brady* material had significant exculpatory value. Applying de novo review, the confidence of the jury verdict was sufficiently undermined. Accordingly, all of the convictions should be reversed and a new trial should be ordered.

## III.  THE COURT BASED ITS DENIAL OF ANDRE DAVIS'S *BRADY* MOTION ON CLEARLY ERRONEOUS FACTUAL FINDINGS

### A. Standard of Review

The government's failure to disclose exculpatory evidence violates due process where it "'undermine[s] confidence' in the outcome" of trial. *Wearry*, 136 S. Ct. at 1006.

### B. The District Court Made Clearly Erroneous Factual Findings in Concluding that the Failure to Disclose Exculpatory Evidence Did Not Prejudice Andre Davis

LaDonna's truthfulness was critical to the government's case against Andre as well as Sherri. As the district court properly concluded, LaDonna's testimony about her conversation with Andre "was crucial I think [to] establishing his willfulness." JA-1691. The government highlighted the LaDonna conversation with Andre in closing argument, JA-1228-1229, giving it added weight because other the evidence against Andre was so weak. *See, e.g., Pasha*, 797 F.3d at 1137-39 (weakness of other evidence contributed to finding of *Brady* violation). The district court erred in finding that the omitted evidence was cumulative of other impeachment evidence,

JA-1715-1716; 1722, because evidence of LaDonna's fraud in filing her personal returns was admissible to show: (1) a prior inconsistent statement, given LaDonna's earlier statement that her tax returns were accurate, JA-0427-0428; (2) dishonesty generally; and (3) LaDonna's knowledge and intent to commit tax fraud. If the evidence against Andre was not insufficient, impeachment of LaDonna became imperative given how little other evidence implicated him in these offenses.

The district court denied Andre's *Brady* motion based on clearly erroneous factual findings, following the government's mischaracterization at the *Brady* hearing of the evidence against Andre, including its argument that: "Andre Davis is the one who's receiving the money for the fee. His bank account is the one receiving the fee for Thomas Jaycox's refund, for Thomas Williams's return and refund, for Anthony Harris's return and refund, for Mario Little's return and refund. All of the returns filed in that tax year, which I believe is 2012, all go to Andre Davis's bank account." JA-1704; *see also* JA-1692 (government argument that jury convicted Andre based not on LaDonna conversation, but on EFIN application and because "[h]e opens up a bank account . . . and has all of the refunds coming into his bank account after Ms. Davis's home is searched"). Contrary to these arguments, no trial evidence showed bank accounts controlled by Andre. Nor did evidence show DFS receipts, much less receipts for fees linked to specific fraudulent returns

45

deposited into any such accounts.[14]  The court queried defense counsel, asking: "Isn't there a problem that Mr. Davis['s] bank account began to get the money on the refunds through the account at the end?"  Defense counsel responded "no," explaining that "there's no indication that he received any proceeds in connection with this." JA-1702-1703.[15]

The court thus erred in finding that the jury heard evidence that "the fees for this Davis Financial Services were deposited in a bank account in Andre Davis's name" and that "there is the evidence of the bank accounts and the financial and EFIN application under his name being applied, and money being put in a bank account in his name for the preparation of those fraudulent tax returns." JA-1721. These clearly erroneous factual findings led the court to conclude that omission of critical impeachment evidence against LaDonna did not undermine confidence in the

---

[14] The only evidence of Andre's bank records was introduced for the first time at sentencing. JA-0310-0312. Even those partial records showed no preparer fees for specific or inaccurate returns, and no indication that Andre received all 2012 preparer fees. *Compare* JA-0310-0312; JA-0631 (showing deposits from "Tax Products PR1" in March, 2013 totaling approximately $3,100.00, in contrast to $16,224 in total fees paid to DFS in early 2013).  Those records also revealed numerous deposits and withdrawals to other accounts, including a debit of $1,400 shortly after deposits by Tax Products of $102, $1,244, and $54.02, respectively (totaling $1,400.02). JA-1586; JA-0311.

[15] Counsel also countered the government's argument regarding the EFIN, stating, "[t]here's absolutely not evidence in this trial or before the jury that Mr. Davis was the one who actually applied for that EFIN number." JA-1701.

46

jury's verdict convicting Andre.  JA-1722-1723.

Accordingly, if this Court does not reverse for insufficient evidence, it should reverse the district court's *Brady* ruling and order a new trial excluding LaDonna's testimony.  *See, e.g.*, *Pasha*, 797 F.3d at 1139 (new trial may require striking evidence or other curative measures).

## IV.  THE DISTRICT COURT COMMITTED REVERSIBLE ERROR BY EXCLUDING EXPERT TESTIMONY THAT SHERRI DAVIS HAS ADHD

### A.  Standard of Review

The exclusion of expert testimony as irrelevant is reviewed for abuse of discretion.  *United States v. West*, 393 F.3d 1302, 1309 (D.C. Cir. 2005); *United States v. Childress*, 58 F.3d 693, 728 (D.C. Cir. 1995).  The trial court's exclusion of evidence under Federal Rule of Evidence 403 as too misleading or confusing is also reviewed for abuse of discretion.  *United States v. Long,* 328 F.3d 655, 662 (D.C. Cir. 2003).

### B. Sherri Davis' Psychiatric Expert Proffered Relevant Evidence That Was Not Confusing

Sherri sought to admit expert testimony concerning her ADHD, which was relevant concerning whether she possessed the requisite criminal intent beyond a reasonable doubt.  The government, pre-trial, sought to exclude the evidence.  The

47

court conducted a hearing, and grounded its exclusionary ruling on whether there was a demonstrable link between ADHD and the requisite mens rea. JA-0663-0667. Also, the court alternatively ruled the evidence inadmissible because the probative value was substantially outweighed by the danger of misleading the jury. *United States v. Davis,* 78 F. Supp.3d 17, 21 (D.D.C. 2015).

The proffered evidence met this Circuit's standards concerning the admissibility of expert testimony on mens rea issues. *See Childress*, *supra*. The relevant conspiracy and tax fraud charges are specific intent crimes requiring the prosecution to establish beyond a reasonable doubt that the defendants knew their actions were unlawful.[16] The government sought to exclude the defense evidence, offered through psychiatrist Dr. Madsen, that Sherri suffered from a "significant case of [ADHD], the inattentive type," and that such evidence was relevant as having a bearing on Sherri's ability to concentrate. This, in turn, was crucial to the defense theory, a case-in-chief defense that the government had not proved the requisite specific intent to knowingly break the law beyond a reasonable doubt.

The court ruled the expert testimony irrelevant and thus inadmissible because the defendant's expert had failed to establish the requisite "link," in substantial part because the expert did not review the specific criminal charges. The court erred.

---

[16]   The jury was so instructed. JA-1190-1191.

48

The link was sufficiently established.  Dr. Madsen opined:

> Ms. Davis's ADHD symptoms include the predominant symptom of inattention.  This means, for one, that she will start something and get easily distracted onto another, making it extremely difficult to complete tasks of any kind, both in her allotted time and without errors.  Indeed, failure to give close attention to details often leads to careless mistakes.  ... Filling out detailed forms would be just such an example that would tax her better functioning considerably.

*See Davis*, 78 F. Supp.3d at 20; JA-0101.

Given that some of the government's evidence established that the taxpayers provided some documentation—even if only blank receipts from reputable charities—to support a tax deduction, and that every taxpayer signed off on their respective tax return thereby acknowledging under penalty of perjury that the figures set forth on the return were accurate, evidence of ADHD was relevant on whether Sherri had sufficient concentration to appreciate the estimations inherent in valuation of charitable contributions and in assessing the propriety of purported business expenses.  It was also relevant on whether she had a sufficient attention span and focus to process the information provided.  Relevance means only that the evidence has "any tendency to make a fact more or less probable than it would be without the evidence."  Fed. R. Evid. 401(a).

The testimony was indisputably relevant, certainly with respect to the several

49

counts where the taxpayer-witnesses admitted to making some charitable contributions. This evidence was relevant as to whether Sherri's inattention could have affected her focus and concentration to make a reasonable estimation of the value of the charitable contributions that the taxpayer witnesses testified to or to conduct prudent follow-up inquiries. This relevance theory also applies to how Sherri may have calculated Schedule C entries.

The court improperly conflated defense counsel's careful effort not to violate Federal Rule of Evidence 704(b) with a purported threshold failure to establish relevance. JA-0641-0645. Thus the court committed an error of law by failing to properly apply the strictures of Rule 704(b) when making its determination that the evidence lacked a requisite link and was therefore "irrelevant." The court even implicitly acknowledged the propriety of defense counsel's argument, noting Sherri's Catch-22 situation had Dr. Madsen reviewed the indictment with her. However, it still maintained its decision to exclude the proffered testimony.[17]

Moreover, the court's alternative holding that, even if relevant, the testimony was too confusing and misleading to be admitted is incorrect and an abuse of discretion. *See Davis*, 78 F.Supp.3d at 21. The proffered testimony tended to

---

[17] The court stated, "I think your concerns are probably right in a couple of ways. One the [704(b)] caselaw; and two, it could expose your client as well to matters if she decides to take the stand. So I think it's a dual-edged sword." JA-0723.

support the proposition that her ADHD affected her focus and attention. That evidence was vital as to whether Sherri had the specific criminal intent to intentionally inflate the amount of charitable contributions of the taxpayers, or whether her ADHD affected her concentration concerning how one properly estimates the amount of a charitable contribution for tax purposes when a taxpayer makes a legitimate charitable contribution but the charity provides only a blank receipt. So too with respect to her ability to make reasonable estimations of the appropriateness of schedule C entries such as mileage and other business related expenses. In assessing whether the government established specific intent beyond a reasonable doubt, the jury should have been able to consider this evidence, even if weak or controverted by prosecution evidence. *See generally Porter v. McCollum*, 558 U.S. 30, 43 (2009) ("it was not reasonable to discount entirely the effect that [a defendant's] testimony might have had on the jury" just because the State provided contrary testimony).

The court's contention that the jury would be so confused so as to misapply the evidence as an "excuse" is meritless. *Davis*, 78 F. Supp.3d at 21. Nothing in the proffered testimony could have been misconstrued that Madsen contended that Sherri's ADHD was an excuse for willful criminal conduct. Cross-examination and a well-conceived limiting instruction, not exclusion, was the legally appropriate

51

route. *See United States v. Hite*, 769 F.3d 1154, 1168-69 (D.C. Cir. 2014) (reversing conviction for excluding expert psychiatric testimony on intent, noting that limiting instruction, not exclusion based on potential jury confusion concerning the requisite intent, more appropriate remedy); *see also United States v. Sandoval-Mendoza*, 472 F.3d 645, 656 (9th Cir. 2006) (trial court abused its discretion in excluding expert testimony concerning defendant's susceptibility to duress based on unsupported claim that testimony would confuse the jury).

Here, the proffered expert evidence was straightforward and would have simply required the jury to evaluate the expert testimony concerning ADHD and apply it to a factual situation well within the understanding of the jury—how to value a charitable contribution when provided with a blank receipt from the charity. *Childress* generally endorses the admissibility of this type of expert testimony. The trial court's talismanic statement that the evidence would have been too confusing is unsupportable.

In *Hite*, the court excluded psychiatric testimony in a prosecution for attempting to persuade a minor to engage in unlawful sexual activity. The defense sought to admit the evidence to support its defense that the defendant possessed only sexual fantasies and possessed no real sexual interest in children. This Court reversed the conviction, rejecting the district court's conclusion that the evidence

posed a risk of confusing the jurors as to the relevant mens rea. This Court directed the district court to consider drafting an appropriate limiting instruction, the common remedy when the shoe is on the proverbial "other foot" where the prosecution seeks to admit evidence over a Rule 403 challenge. *See Hite,* 769 F.3d at 1168-69.

Here, the court's error was similarly an abuse of discretion. *Koon v. United States*, 518 U.S. 81, 100 (1996) (a district court, by definition abuses its discretion when it commits an error of law). The trial court committed an error of law when it concluded no link was established and alternatively abused its discretion when it determined exclusion, rather than a limiting instruction, was necessary.

Nor was the error harmless. This evidence was the entirety of Sherri's ADHD evidence. This exclusionary ruling deprived Sherri of important evidence which could have supported a favorable defense instruction and further buttressed its contention that the government had not established the requisite specific intent beyond a reasonable doubt. *See United States v. Cohen*, 510 F.3d 1114, 1127 (9th Cir. 2007) (improper exclusion of expert testimony not harmless where central to the defense). Thus, the exclusion of the expert testimony, the only plausible source of critically important testimony, was both an abuse of discretion and harmful error. Reversal is required.

53

## V.  THE DISTRICT COURT ABUSED ITS DISCRETION BY NOT GRANTING SHERRI DAVIS A NEW TRIAL BASED ON THE GOVERNMENT'S INCENDIARY AND IMPROPER COMMENTS DURING CLOSING REBUTTAL ARGUMENT

### A.  Standard of Review

The district court's decision whether to grant a new trial "in the interests of justice," Fed. R. Crim. P. 33, is reviewed for abuse of discretion. *United States v. Rojas*, 520 F.3d 876, 884 (8th Cir. 2008).[18]

### B.  The Government's Rebuttal Comments Warrant Reversal

Sherri mounted a "case-in-chief" defense, attempted to expose shortcomings in the government's case, and sought to undercut the credibility of the government's key witness.  In the very last words of its rebuttal, the government exhorted, "[t]his is your evidence... [t]hese defendants are guilty as charged.  Sherri Davis is not going to stop until somebody tells her to stop. Your job is to tell her to stop." JA-1309.  So determined to have that *coup de grace* exhortation resonate with the jury, the government did not even conclude by thanking them.

Immediately thereafter, defense counsel sought a bench conference.  There, counsel articulated four objections to the government's rebuttal.  The fourth objection concerned the final exhortation:

---

[18] Alternatively, this issue should be remanded to the district court to determine whether counsel's failure to immediately request a mistrial constitutes ineffective assistance of counsel. *See* Part VIII *infra.*

54

> [A]t the very end of his argument he said Sherri Davis
> won't stop until you tell her to stop. This is an absolutely
> improper argument. The jury can never be told that they
> have to convict the defendant in order to stop her from
> doing something in the future. There's all kinds of
> [Circuit] caselaw about that. It's patently improper.
>
> So I'm not going to ask for a mistrial or anything like that,
> but I would ask for curative instructions on all four of
> these points.

JA-1311. This final comment was so blatantly improper the district court did not

even permit the government to address the issue. Instead, the court instantly

indicated it would "tell them to just ignore it." JA-1313.

The prosecution, having just been informed that its final words to the jury,

long-planned oratory calculated to achieve maximum effect, were improper, made

no effort to argue otherwise.[19] The government simply replied "[t]hat would be fine

your honor." JA-1313. The court ended the bench conference and informed the jury

of four corrections, concluding:

> And finally there is reference to she won't stop unless you
> tell her to stop. I'm striking that part of the argument as
> improper argument to the jury. That's not appropriate. So
> just ignore that last comment of government counsel.

---

[19]  *See, e.g., United States v. Henry*, 545 F.3d 367, 377 (6th Cir. 2008) (recognizing
"wide latitude" afforded prosecutor in closing argument). Three months later,
responding to Appellants' Rule 33 motions, the prosecution belatedly argued that the
comment was proper. JA-0157; JA-0170; JA-1367. However, the court adhered to
its earlier determination.

JA-1314.

## C. The Improper Comments Were Sufficiently Egregious to Warrant a New Trial

The government's final rebuttal comment was sufficiently egregious to warrant a mistrial. The curative instruction was inadequate. Thus, the court abused its discretion in denying the new trial motion.

The trial court may grant a new trial if the interest of justice so requires. Fed. R. Crim. P. 33. The court must determine whether 1) the prosecutor's remarks were improper, and 2) the remarks prejudicially affected the defendant's substantial rights by depriving the defendant of a fair trial. *United States v. White*, 241 F.3d 1015, 1023 (8th Cir. 2001). In evaluating prejudicial effect, the court considers 1) the severity of the misconduct; 2) the measures adopted to cure the misconduct; and 3) the certainty of the conviction absent the improper remarks. *United States v. Monaghan,* 741 F.2d 1434, 1443 (D.C. Cir. 1984).

Here, the jury had just weathered a complex trial where the prosecution sought to prove an elaborate and costly tax fraud scheme. The jury understood that the government had given a sweetheart deal to its key "cooperating witness," and had immunized or had otherwise conveyed that the scores of complicit taxpayer-witnesses who had reaped the lions' share of the improper tax refunds, would not

56

face any criminal consequences. Now, with only the defendants left to blame, the prosecution lowered the boom, and intoned in its final rebuttal comment that the jury represented the last and only hope of holding anyone accountable for this financial rip-off of the government, that they were duty bound to stop Sherri from doing future irreparable financial harm to the public fisc, and implored them to return a guilty verdict—regardless of whether such a verdict was supported by the evidence. This was highly inflammatory improper argument.

"[P]rosecutors should refrain from injecting issues broader than the accused's guilt or innocence, or predicting the consequences of a particular verdict. Such tactics divert the jury from its duty to decide the case on the evidence." JAMES CISSEL, FEDERAL CRIMINAL TRIALS §1-2[c], 306 (8th ed. 2013). Prosecutorial statements whether deliberate or otherwise, that tend to incite and inflame the jury or which are likely to cajole a guilty verdict without full consideration of the evidence may amount to reversible error despite curative instructions. *Id.* at §11-2[c][1], 307. Here, "the prosecutor was clearly impermissibly encouraging the jury to come to a verdict based not on "[the defendant's] guilt or innocence, but on the 'potential ramifications' of the verdict." *United States v. Sanchez*, 659 F.3d 1252, 1256 (9th Cir. 2011).

A prosecutor "may not ask jurors to find defendant guilty as means of

57

promoting community values, maintaining order, or discouraging future crimes."
*United States v. Johnson*, 231 F.3d 43, 47 (D.C. Cir. 2000); *Brown v. United States*,
370 F.2d 242, 246 (D.C. Cir. 1966) (prosecutor's admonition that conviction
essential in order to maintain law and order in community deemed improper). Other
Circuits have similarly found reversible error when the prosecutor cynically
conjured up illusions of hopelessness, fear, and destruction of the social fabric
should the jury have the temerity return an acquittal. *See, e.g., United States v.
Barker*, 553 F.2d 1013, 1026 (6th Cir. 1977) (prosecutor's statement that if the
defendants are acquitted "[w]e might as well open up all the banks and say 'come on
in and get the money, boys,'" deemed reversible error).

Here, the prosecutor's comments were equally egregious, and undermined the
defendant's fair trial rights. *See United States v. Beeks*, 224 F.3d 741, 746-47 (8th
Cir. 2000); *United States v. Solivan*, 937 F.2d 1146, 1150-56 (6th Cir. 1991) (jurors
are likely to "place great confidence in the faithful execution of the obligations of a
prosecuting attorney, improper insinuations or suggestions [by the prosecutor] are
apt to carry weight against a defendant" and a *single* misstep by prosecutor may be
so destructive so as to require a new trial) (emphasis added).

This is particularly true where, as here, the case hinged on the credibility of
the government's key cooperating witness.  When the prosecution's case centers on

58

witness credibility, these types of prosecutorial missteps likely affect the jury's ability to decide the case fairly. *Sanchez*, 659 F.3d at 1260-61. Like *Sanchez*, the prosecutor's improper conduct "raised the specter of future lawbreaking to divert the jury from its obligation to reach a verdict based solely on the evidence." *Id*. at 1259.

Receipt of a curative instruction was inadequate. *See Solivan*, 937 F.2d at 1156 (reversing conviction noting that regardless of strength of the case against defendant, instructions given by district court insufficient to mitigate negative and highly prejudicial impact of final argument errors). As noted above, the improper comment occurred as the final rebuttal comment where the defense has no opportunity to respond. It was literally the last word in all its powerful impropriety.

In evaluating whether the improper argument was sufficiently egregious to warrant reversal, several sister circuits have recognized the significance of improper argument occurring during rebuttal—the last words of argument the jury heard before deliberations. *See Sanchez*, 659 F.3d at 1259; *see also United States v. Carter*, 236 F.3d 777, 788 (6th Cir. 2001) (finding significant that "[t]he prosecutor's improper comments occurred during his rebuttal argument and therefore were the last words from an attorney that were heard by the jury before deliberations"); *United States v. Hall*, 413 F.3d 770, 776 (8th Cir. 2005) (potential for prejudice great where improper remarks made during closing argument, especially where defense

59

has no opportunity for rebuttal). As the Ninth Circuit noted in *Sanchez*, "given the timing, the impact was likely to be significant." *Sanchez*, 659 F.3d at 1259.

In such circumstances, general curative instructions are inadequate. *See Solivan*, 937 F.2d at 1156; *see also United States v. Kerr*, 981 F.2d 1050, 1053-54 (9th Cir. 1991) (curative instruction insufficient to overcome unfair prejudice of government misconduct). Here, the key curative instruction was given as the last of a series of what were essentially cursory corrective instructions. It mixed the critical misconduct with other technical corrections dealing with limited admissibility and the requisite intent. As noted in *Kerr*, it is "very doubtful these admonitions 'really conveyed a sufficient sense of judicial disapproval of both content and circumstances needed to dispel the harm in the core of the prosecutor's statements.'" *Id*. at 1053 (citations omitted).[20]

_____

[20]    The trial court agreed with the government's contention that the last thing the jury heard was the curative instruction, not the improper argument. JA-1367; JA-1381. This is misleading. The curative instruction was given as part four routine instructions that did not necessarily lessen the incendiary impact of the government's improper comments. Moreover, the trial court emphasized that the jury earlier had received the standard "arguments of lawyers are not evidence" instruction, JA-1165, which was not repeated when the "curative" instruction was given. The court concluded that this previously tendered general instruction was a determinative factor that mitigated any unfair prejudice. JA-1380-1382. The court's conclusion is incorrect. Otherwise, the mere tendering of a standard instruction at some earlier juncture of the trial would inoculate any government closing argument misconduct, regardless of egregiousness, from any meaningful appellate review. *See Kerr*, 981 F.2d at 1053 (noting curative inadequacy of instructions that are "routine

If anything, the curative instruction likely reinforced the inflammatory argument and seared it in the jurors' minds. The court somewhat informally told the jury "so just ignore that last comment of government counsel."    JA-1314. Realistically, the court made it largely impossible for the jury to ignore the improper comment.

This legal conundrum is familiar and vexing. Under analogous circumstances, Justice Stevens famously observed that telling a jury to avoid reference to a defendant's silence is as fruitless as telling someone "not to think of a white bear." *Lakeside v. Oregon*, 435 U.S. 333, 347 (1978) (Stevens, J., dissenting).[21]

Third, a conviction was far from certain. The case centered largely on LaDonna's credibility. All of the taxpayer-witnesses were compromised; several denied having any knowledge of the inaccurate deductions although they had taken

---

directions for evaluating testimony").

[21] Justice Stevens stated "telling the jury [through cautionary instructions] to ignore the defendant's silence is like telling them not to think of a white bear." *Lakeside,* 435 U.S. at 347. His "white bear" comment alludes to Dostoevsky, who posited "[t]ry to pose yourself this task: not to think of a polar bear, and you will see that the cursed thing will come to mind every minute." FYDOR DOSTOEVSKY, WINTER NOTES ON SUMMER IMPRESSIONS 49 (D.Patterson 2d paperback ed. 1997). Psychologist Daniel Wegner has studied the "white bear phenomenon," demonstrating the acute difficulty in suppressing a particular thought by trying not to think about it and only succeeding in making it impossible not to think about the forbidden subject. DANIEL WEGNER, WHITE BEARS AND OTHER UNWANTED THOUGHTS: SUPPRESSION, OBSESSION, AND THE PSYCHOLOGY OF MENTAL CONTROL (1994).

similar deductions on prior returns prepared by entities having no connection to Sherri or Andre.   The prosecution, having given all of the taxpayers a pass on criminal prosecution, and given a sweetheart deal to the key cooperating witness who had confessed her criminal involvement in the charged scheme, had no one, other than appellants, to hold criminally responsible for this and future raids on the public fisc.   Thus, the improper statement calculatingly sought to divert the jury's attention from the intent evidence residing on the fence line of reasonable doubt by exhorting the jury to return a verdict based on emotion to deter future lawbreaking, rather than the law and evidence presented at trial.

The government has already tacitly acknowledged the weakness of its case. In opposing the Rule 33 motion, the government subtly but substantially changed its theory of the case.   For the first time, it argued that the evidence established that "some of [the taxpayer clients] *wanted a false return prepared for them*."   JA-1371 (emphasis added).   However, this argument was *never* made to the jury.[22]   During

---

[22] During closing argument, the government asserted that "the tax customers … wanted a big refund," JA-1266, and amplified:

> The customers didn't come in there and say "hey, put a fake business on my return, and by the way, let's just claim fake mileage.

> One of the other things that the customers said is that they don't know how to do their returns.   They did like the refund amounts they were getting, and they didn't question

62

the trial the prosecution made a strategic decision to sidestep the problematic quandary concerning the culpability of the taxpayers[23] and decided it was necessary to buttress its weak case by relying on the irredeemably prejudicial incendiary closing argument statements.    This post-verdict legal sleight of hand reveals government recognition that the evidence of guilt presented at trial was not overwhelming.

The prosecutorial misconduct fatally compromised Sherri's fair trial rights. The court should have granted a mistrial for manifest necessity immediately after the government's incendiary rebuttal.    Having not done so, the court abused its discretion by denying the post-verdict motion for a new trial. *See Solivan*, 937 F.2d at 1156 (reversing conviction where mistrial should have been granted based on

---

it, but they also said, "I don't know how to do it." One of the witnesses said, "If I knew how to do it myself, I would do it myself." Ask yourself:  Why are they paying her hundreds of dollars every year, sometimes up to $500, if they could prepare their  own returns? They don't. That's why they go to a tax prep service.

JA-1215-1216.

This recasting of the prosecution's theory demonstrates it recognized the evidentiary weakness of the theory it argued to the jury and undercuts the "certainty of conviction" prong of the Rule 33 determination. The government's failure to expressly acknowledge its switch in position during post-trial litigation is troubling, given its heightened level of candor owed to the tribunal.

[23]  In addition, as set forth in footnote 4 *supra*, the government initially asserted that the taxpayer witnesses faced no Fifth Amendment concerns and therefore required no statutory immunity to testify.

63

government improper closing argument).

## VI. THE GOVERNMENT'S CLOSING ARGUMENT PLAINLY MISREPRESENTED THE EVIDENCE AGAINST ANDRE DAVIS

### A. Standard of Review

This Court's "review of allegedly improper prosecutorial arguments is for substantial prejudice where the defendants lodged an objection, but [the court] appl[ies] the plain error standard where they fail to object." *United States v. McGill*, 815 F.3d 846, 888 (D.C. Cir. 2016). To be corrected, plain error requires "'(1) error; (2) that is plain; [ ] (3) that affects substantial rights; [and (4) that] seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *United States v. Venable*, 269 F.3d 1086, 1089 (D.C. Cir. 2001) (internal citations and quotation marks omitted).

### B. The Prosecutor Misrepresented Banking Evidence, as well as the LaDonna Conversation and Other Evidence Against Andre Davis

The district court plainly erred in failing to correct the government's mischaracterization of the evidence against Andre in closing argument. The government's argument was especially prejudicial regarding tax preparation fees, telling the jury that: "It's going to his bank account. It's not going to the bank account that's the Bank of America account that you heard a lot about, but you'll see

64

the bank account that Andre Davis asked TaxWise to send those fees to." JA-1212. In rebuttal, the government continued: "You'll see that the money coming out and being directed by the EFIN holder at this point . . . is going to an account designated by Andre Davis, not Sherri Davis; that all the EFIN application information and all the returns that were filed in the 2013 year with respect to the 2012 returns were directed to a bank account designated by Andre Davis. It was not the bank account in Sherri Davis's name, and that makes sense because by that point it was Andre Davis who was the face of the business." JA-1292-1293; *see also* JA-1302 ("You will see the fees in Government Exhibit 15.8 [sic] for the 2013 year, the fees that Andre Davis and Sherri Davis got. And it worked. They made money.").[24] As explained above, no trial evidence showed bank accounts in Andre's name, Andre's receipt of preparer fees, or who directed Taxwise where to deposit DFS preparer fees. Nor did evidence prove that "all" proceeds went to an account designated by Andre.

The government inaccurately characterized other evidence as well. In

---

[24] No exhibit 15.8 was admitted; the reference was apparently to Exhibit 5.18; *see also* JA-1212 ("exhibit[s] 5.4, 5.5, 5.8, and 5.18 [ ] are documents from Taxwise where it shows the Defendant Andre Davis applying for the software that the Defendant Sherri Davis was using in prior years as well"). Only Exhibit 5.4 lists Andre's name and a bank account ending in "6107." JA-0630. That document lists no monetary amount and does not show that Andre applied for Taxwise software, instructed Taxwise to pay fees to bank accounts in his name, or had any connection to an account ending in "6107."

65

rebuttal, the government argued: "The illegal part is that *they* didn't accurately report the gross receipts that they were earning," JA-1302 (emphasis added). This statement was unsupported because no evidence was admitted regarding Andre's income, receipts, or personal returns. Elsewhere, the government told the jury "why would these two witnesses, particularly Mario Little and Thomas Jaycox, when they said 'No, I saw the defendant, he was there, he was doing my return,' why would they lie?" JA-1219. Contrary to this statement, on redirect, Jaycox corrected his earlier testimony to recall an unidentified young man who did the initial part of his taxes, and Little never testified that Andre "was doing" his return. In connection with Jaycox's testimony, the government also argued that "these are the same Goodwill receipts that went into a copy machine, and that Sherri Davis or Andre Davis just accidentally gave them the original versions," JA-1302, though Jaycox's 2012 return included no charitable Goodwill contributions. The government further argued that "Thomas Jaycox said Andre Davis prepared [the return] and Sherri Davis came over to make sure it was OK, or something to that effect," JA-1220, in contrast to Jaycox's actual testimony that Sherri Davis "finalized" and "finished everything else out" on his 2012 return, indicating more than mere review.

In addition, the government misrepresented LaDonna's testimony about her conversation with Andre, arguing: "[H]ow do we know that the Defendant Andre

66

Davis acted willfully?  You heard LaDonna Davis . . . [S]he goes to Andre Davis and she says, 'Why are you doing returns with your mother?  You see the trouble I'm in.  You see the criminal charges I'm facing.  Why are you doing returns with her?'  And he says, 'Don't worry.  I know what I'm doing.'  So he knows."  JA-1228-1229; *see also* JA-0284.  Contrary to the government's closing, LaDonna never testified that she mentioned her own criminal charges or that Andre claimed to "know what [he was] doing."  Instead, she said she told Andre he shouldn't get involved with his mother because of "everything else that was going on," and that Andre responded "that it wasn't a big deal, and that it was just going to go away." JA-0785.

The "prosecutor may not refer in the opening or closing statement to evidence not admitted at trial." *United States v. Valdez*, 723 F.3d 206, 209 (D.C. Cir. 2013); *see also United States v. Moore*, 651 F.3d 30, 51 (D.C. Cir. 2011); *United States v. Maddox*, 156 F.3d 1280, 1282 (D.C. Cir. 1998) (attorney's misstatement of evidence "amount[s] to blatant hearsay about matters not in the record" about which "attorney makes himself an unsworn witness;" prosecutor's transgression deprives defendant of rights to cross-examination).  Although defense counsel did not object to the prosecutor's numerous misstatements, their lack of evidentiary support was obvious. *See, e.g., United States v. Watson*, 171 F.3d 695, 700 (D.C. Cir. 1999) (on harmless

67

error review, comparison of evidence with prosecutor's argument "is apparent on the face of the record"). The misstatements affected Andre's substantial rights because they were central to the case against him, nothing mitigated their effect, and the case against Andre was very close. *See, e.g., McGill*, 815 F.3d at 877; *Valdez*, 723 F.3d at 209. Particularly evaluated in conjunction with the omission of *Brady* evidence discussed above, the government's closing arguments affected Andre's substantial rights and should be corrected by this Court.

## VII. THE COURT ERRED OR PLAINLY ERRED IN CALCULATING ANDRE DAVIS'S SENTENCING GUIDELINES, AND BOTH APPELLANTS' LOSS AND RESTITUTION

### A. Standard of Review

This Court reviews a district court's factual findings, including loss, for clear error. *United States v. Brockenborrugh*, 575 F.3d 726, 738 (D.C. Cir. 2009); *United States v. Leonzo*, 50 F.3d 1086, 1088 (D.C. Cir. 1995). It "give[s] due deference to the court's application of the guidelines to the facts." *United States v. McCants*, 554 F.3d 155, 160 (D.C. Cir. 2009) (*McCants II*) (citing 18 U.S.C. § 3742(e)). The government bears the burden of proving loss and, if this Court remands, it should do so on the existing record. *Leonzo*, 50 F.3d at 1088 (government does not get "second bite at the apple"). A district court must also explain its calculation of loss.

*United States v. Brown*, 808 F.3d 865, 871 (D.C. Cir. 2015); *United States v. Hall*, 610 F.3d 727, 744-45 (D.C. Cir. 2010); *In re Sealed Case*, 527 F.3d 188, 240 (D.C. Cir. 2008).

Plain error at sentencing is subject to the same standard of review as trial error, *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1343 (2016), except that this Court applies a less exacting standard for prejudice. *United States v. Saro*, 24 F.3d 283, 287-88 (D.C. Cir. 1994).

### B. The Court's Loss Finding for Andre Davis Did not Support Its Guidelines Calculation

The district court held Andre Davis accountable for loss totaling $27,537. JA-1523.[25] Under § 2T4.1, the base offense level for loss of $27,537 was 12. The court thus plainly erred in applying an offense level of 14, applicable to loss greater than $30,000. *Id.*; U.S.S.G. § 2T4.1 (2014).[26] The court added two points for operating a business of preparing tax returns, to reach a total offense level of 16 and a recommended guidelines range of 21-27 months' imprisonment, whereas the correct

---

[25] Undersigned counsel for Andre Davis confirmed with the court reporter that the sentencing transcript correctly reflected the court's loss finding of $27,537 for Andre, despite the government's request and the PSR's recommendation for loss findings of $37,537.

[26] After November 1, 2015, when the tax loss table was amended, both figures corresponded to a level 12. U.S.S.G. § 2T4.1 (2015) (assigning level 12 to tax loss of $15,000-$40,000).

total offense level should have been 14, with a guidelines range of 15-21 months.

This Court should uphold this finding, which the government did not appeal. *See Greenlaw v. United States*, 554 U.S. 237, 254 (2008). The loss finding controls the sentence because "'criminal defendants . . . "need to be able to trust the oral pronouncements of district court judges.'" *United States v. Godoy*, 706 F.3d 493, 495 (D.C. Cir. 2013) (internal citations omitted). An oral pronouncement is "the pronouncement of sentence [that] constitutes the judgment of the court." *Gilliam v. United States*, 269 F.2d 770 (D.C. Cir. 1959); *see also United States v. Fareri*, 712 F.3d 593, 595-96 (D.C. Cir. 2013); *United States v. Lewis*, 626 F.2d 940, 953 (D.C. Cir. 1980).

The court's below-guidelines sentence of 60 months' probation might have been lower had the court considered the correct guidelines range of 15-21 months' imprisonment. *Molina-Martinez*, 136 S. Ct. at 1345-47 (in most cases, reliance on incorrect guideline range requires remand for resentencing on plain error review). Accordingly, this Court should remand for resentencing.

### C. For Both Defendants, the District Court Failed to Resolve Objections to the Government's Loss Allegations and Failed to Make Required Factual Findings

The district court also failed to address defendants' objections to loss allegations at sentencing, improperly treated fixed loss figures as estimates, and

failed to make factual findings regarding disputed facts. The court based its calculation of $1,442,050 in loss for Sherri and $27,537 in loss for Andre on the testimony of IRS Special Agent Abunaker Naim, a spreadsheet prepared by IRS agent Tammy Barker, testimony of Merlyn Jules, an auditor with DC-OTR, and a spreadsheet prepared by the D.C. Office of Tax and Revenue. JA-0293-0304; JA-0632-0634; JA-1437-1493.

During the sentencing hearing, the government questioned Agent Naim about Government Exhibit S1, an abridged version of the IRS spreadsheet, JA-0632-0634, which listed specific taxpayers, tax-years, and loss calculations. Naim testified that the spreadsheet's loss figures reflected deductions specific taxpayers had agreed were false or had not provided to the preparer, and were based on interviews Naim or his colleagues had conducted with all of the listed taxpayers. JA-1438-40; JA-1445-1446; JA-0632-0634.

On cross-examination, defense counsel questioned Naim about an unabridged version of that spreadsheet attached to the government's sentencing memo, which contained a column omitted from Exhibit S1 entitled "Description of determination." JA-0289-0291. The descriptions listed included: (1) "Based on MOI" (referring to the Memorandum of Interview IRS agents created after interviewing taxpayers); (2) "Per DOJ Instructions;" (3) "based on preparer pattern;" and (4) references to audit

71

amounts (e.g., Ingra Jones, 2008, "Audit amount, paying off 2007 balance;" Anthony Harris, 2010, "$1,668 potential audit, unsure what this is"). One listing (for Thomas Williams) stated "Additional tax due, no payments yet." *Id.*

Naim could provide no explanation for the description "per DOJ instructions," or that of "based on preparer pattern." JA-1451-1453; JA-1460-1461. He agreed that Carlos Little's MOI discussed only his 2012 return, and therefore the spreadsheet incorrectly described his 2007 and 2008 returns as "based on MOI." JA-1456-1457; JA-1487-1491. He did not know whether any other entries described as "based on MOI" contained information not reflected in the MOI's for those taxpayers. JA-1457. As noted above, loss related to LaDonna was not reflected in her MOIs. At first, in response to questioning about whether LaDonna had admitted tax fraud not reflected in an MOI, Naim testified: "That's not possible," explaining that all false deductions discussed with taxpayers were notated in MOIs. JA-1448-1449. Naim also testified, however: "I didn't prepare the chart, so I don't know if there's years that weren't mentioned in the MOI that are shown here. It's not a calculation I came up with." JA-1457. Clearly, Naim was not the proper witness to explain the government's spreadsheet, as he provided no basis for its entries and could not vouch for its reliability.

D.C. Tax Auditor Merlyn Jules testified that Government Exhibit S2 listed

72

clients of 2FT to whom DC-OTR had sent letters asking for substantiation of deductions or statements made on their returns, who failed to provide a satisfactory response, and for whom parts of their refunds were disallowed.  JA-1465-1477. Counsel for Sherri contested that evidence, noting that Exhibit S2 listed over 500 returns, none of those taxpayers had been personally contacted, they may have been responsible for any identified discrepancies or failed to respond to DC-OTR for unknown reasons, and the evidence was insufficient or insufficiently reliable to find that Sherri was responsible for amounts disallowed by DC-OTR.   JA-0339; JA-1497-1498.

Both defendants asked the court to make factual findings regarding loss by a preponderance of the evidence and to ensure that those findings were based on reliable evidence, noting that several listed taxpayers had not testified at trial and that defendants had been acquitted in connection with some counts for which loss was claimed.  They argued that Naim's testimony did not support loss figures not "based on MOI" and called into question even those "based on MOI," given his admission that Carlos Little's 2007 and 2008 losses were not "based on MOI."  In addition, counsel noted that several taxpayers (Deborah Johnson, Jason Knight, Mario Little, and Leonard Durrett) had claimed similar false deductions using tax preparers other than 2FT and DFS, and that Naim could not answer whether

73

information from other taxpayers could be challenged for similar reasons or whether others had incentives in interviews to blame false returns on the defendants. Andre, who joined in Sherri's objections, also objected at sentencing to loss figures other than those associated with Thomas Jaycox's 2012 return ($14,905). He also argued that he should not be held responsible for Sherri's personal 2012 return. JA-0336-0339; JA-0316-0317; JA-1431-1432; JA-1495-1499.

The government contended that it had met its burden of proof by a preponderance of the evidence, the defendants were liable at sentencing for all reasonably foreseeable acts in furtherance of the conspiracy, and the district court was authorized to consider acquitted conduct. The government also argued that the court need not "come to an exact figure" on loss, that Carlos Little was deceased by the time of trial, and that "[a]ll the rest of the witnesses . . . were interviewed, personally spoken to by someone from the IRS, and/or personally testified here at trial." JA-1500-1503.[27]

In deciding loss, the court conflated defendants' challenge to the sufficiency and reliability of the sentencing evidence with a challenge to the accuracy of an estimate of loss, which the court found did not have to be precise. JA-1515; JA-

---

[27] Taxpayers who did not testify at trial for whom the court found loss to the IRS included: Carlos Little, Deborah Holmes, Ingra Jones, Jacqueline Hart, Kenneth Merritt, Kevin Watkins, Kimberle Davis, Lashaun Banks, Lisa Lee, Neda Graves, Stacey Savoy, and Vodika McClain.

1519; JA-1521. By treating specific factual disputes as challenges to the precision of estimates, the court failed to evaluate the sufficiency and the reliability of the evidence. *Cf. United States v. Schroeder*, 536 F.3d 746, 753-54 (7th Cir. 2008) (court confused accuracy or reliability of evidence with sufficiency by preponderance of evidence, which required that evidence be more probable than not). The district court approach was therefore not consistent with *United States v. Bryant*, 128 F.3d 74, 76 (2d Cir. 1997), which upheld the extrapolation of an average amount of loss for 7,000 unaudited returns. *See* JA-1516-1517 (district court relying on *Bryant*). Here, in contrast, the claimed loss involved 24 taxpayers in specific years and the court was not asked to extrapolate, estimate, or average loss figures.

The court was required to determine whether the government's evidence was (1) reliable; and (2) sufficient to find precise loss figures that were more probable than not. Among other things, the court made no findings to support losses related to counts on which defendants were acquitted (for Sherri, $5,182 related to Johnson's 2012 return and $14,905 related to Jaycox's 2012 return; for Andre, $5,182 related to Johnson's 2012 return and $413 related to Mario Little's 2012 return). JA-0131-0139; JA-1146-1147. The court also failed to find that the spreadsheet was accurate, despite errors in its description of the basis for 2007 and 2008 losses for Carlos Little, Naim's inability to explain numbers based on

75

"preparer pattern" or "DOJ instructions," and notations such as "unsure what this is." JA-0289. Contrary to the court's summary conclusion, Naim's testimony and the government's spreadsheet provided neither a preponderance of the evidence nor sufficiently reliable evidence to prove the government's loss allegations. *See, e.g., United States v. Kpodi*, 2016 WL 3063507, at *4-5 (D.C. Cir. May 31, 2016) (reversing sentence based on clearly erroneous factual findings); *United States v. Kynard*, 427 F. App'x 755, 758-59 (11th Cir. 2011) (court "must not speculate," and erred in relying on government proffer to find loss, and in failing to "'make individualized findings concerning scope of conduct undertaken by particular defendant'") (citation omitted); *United States v. Mehta*, 594 F.3d 277, 272-83 (4th Cir. 2010) (reversing loss finding based on extrapolation where court lacked sufficient information from which to extrapolate, but finding error to be harmless); *see also United States v. Toto-Ngosso*, 407 F. App'x 687, 691 (4th Cir. 2011) (upholding loss calculation "based on statements made by the clients themselves establishing the falsity of the deductions").

Further, the court made no findings as to why Sherri's filing of a false personal return in 2012 was within the scope of the conspiracy, committed in furtherance of the conspiracy, and reasonably foreseeable to Andre. U.S.S.G. § 1B1.3(a)(1)(B); *see also United States v. Burnett*, 2016 WL 3648520, at *9 (D.C.

76

Cir. July 8, 2016); *McCants II*, 554 F.3d at 161-62. Even if the court's loss findings implied that the court made those decisions, it failed to explain them. *United States v. McCants*, 434 F.3d 557, 561-62 (D.C. Cir. 2006) (*McCants I*) (remanding where court failed to make findings on disputed facts, or failed "to spell out its findings," as required to facilitate appellate review).

In addition, the court side-stepped objections, holding that, "[w]hile [defendants] could challenge some of the individual figures, it seems overall it's essentially an accurate recitation of . . . the Federal Government's losses." JA-1519. In so ruling, the court failed to resolve specific challenges and make findings on disputed facts, while hewing to its erroneous determination that "precision" was not required. The court's approach was especially troubling given that Naim's testimony failed to support and even contradicted the government's basis for some spreadsheet figures. The court noted its familiarity with the evidence at trial, JA-1515, but taxpayer witnesses who testified about inflated deductions failed to quantify loss to the IRS, or disclose their tax rates. Several did not reveal the value of goods they in fact donated, for which their returns stated inflated values. LaDonna's testimony did not reveal her independent fraud. Taxpayer trial testimony in itself, therefore, did not provide a basis for calculating loss.

The court also failed to resolve Sherri's challenges to the DC-OTR evidence.

77

In *Schroeder*, the court reversed the district court's reliance on evidence closely resembling the DC-OTR evidence used to more than double the loss for Sherri. In particular, the court found in *Schroeder* that the civil audit in that case "revealed only that clients of Schroeder who were audited had overstated their deductions" but "did not purport to attribute responsibility for the improper deductions," which could have been due to "a mistake or fraud on the part of his taxpayer clients." *Schroeder*, 536 F.3d at 754-55. This Court should reach the same conclusion here, and reverse loss findings based on the DC-OTR evidence.

If this Court does not vacate defendants' convictions, it should remand for resentencing on the existing record. *See, e.g.*, *Vega*, 2016 WL 3457715, at *16-18; *Leonzo*, 50 F.3d at 1088.

## D. The Court Erred or Plainly Erred in Calculating Restitution

This Court should also remand for recalculation of defendants' restitution. The court ordered $642,103 in restitution for Sherri (related to loss to IRS, of which $37,537 was joint and several to Andre), and $37,537 in restitution for Andre. JA-1560; JA-1591. As with loss, the government bears the burden of proving restitution by a preponderance of the evidence, 18 U.S.C. § 3664(e), for actual, provable "loss caused by specific conduct that is the basis for the offense of conviction," and the court must articulate more than conclusory findings in support of restitution. *United*

78

*States v. Pole*, 741 F.3d 120, 128 (D.C. Cir. 2013); *United States v. Fair*, 699 F.3d 508, 512-13 (D.C. Cir. 2012); *United States v. Lemire*, 720 F.2d 1327, 1354 (D.C. Cir. 1983).

Just as the court failed to resolve guidelines disputes, as explained above, it failed to find by a preponderance of the evidence that the government proved loss in support of restitution. In particular, the court failed to make findings regarding the grounds under which defendants owed restitution for acquitted counts and failed to evaluate the IRS spreadsheet in light of Naim's testimony. For Andre, the court failed to decide whether, for 2012 returns for which Andre was not a named defendant (including $441 for Carlos Little; $4,598 for Anthony Harris; $6,625 for Thomas Williams; and $830 for Jason Knight), the IRS was "directly harmed by [Andre's] criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2).

Finally, the court failed to address Andre's argument that he should not be held responsible for $4,443 in restitution associated with Sherri's personal returns. JA-1578. The conspiracy charged in count 1 did not involve co-conspirators' personal returns. Accordingly, the Mandatory Victims Restitution Act (MVRA), § 3663A, did not authorize imposition of $4,443 in restitution for Andre in connection with Sherri's 2012 personal return.

79

## VIII.   SHERRI DAVIS'S TRIAL COUNSEL RENDERED CONSTITUTIONALLY INADEQUATE REPRESENTATION

### A.   The Alternative Mistrial Remedy

#### 1.   Standard of Review

This Circuit generally remands to the trial court when "colorable" ineffective assistance claims are raised for the first time on appeal. *United States v. Mohammed,* 693 F.3d 192 (D.C. Cir. 2012); *United States v. Mouling.* 557 F.3d 658, 668 (D.C. Cir. 2009). However, "[this Court has] recognized two exceptions to the general practice: "'when the trial record conclusively shows that the defendant is entitled to no relief, and the 'rare exception when the trial record conclusively shows the contrary.'" *Id.* at 669 (*citing United States v. Fennell*, 53 F.3d 1296, 1303-04 (D.C. Cir. 1995)).

#### 2.   The Record Sufficiently Establishes a New Trial is Required

Although trial counsel's decision to ask for a curative instruction, instead of requesting a mistrial, may initially appear to be a reasonable tactical decision, the record conclusively establishes otherwise. *See, e.g. Mouling,* 557 F.3d at 669. Litigating the post-trial *Brady* motion, defense counsel argued in detail how the defense strategy would have been substantially different had the government timely disclosed the critical evidence concerning its key cooperating witness. Defense counsel acknowledged that, lacking the *Brady* statement, the defense pursued a

80

standard failure of proof defense that relied heavily on effective cross-examination

of LaDonna—which did not occur. Counsel stated at that hearing:

> My own reaction, your Honor, *is that when I was crossing
> [LaDonna] I thought the cross in all candor was pretty
> ineffectual.* I mean certainly, your (sic) know, I kind of
> went through what you might think of as a typical litany in
> cross examining a cooperating witness. We talked about
> her plea agreement and so on. I didn't think any of it
> particularly made an impression on the jury.    The
> government made the argument with respect to her that
> they would typically make with respect to every
> cooperator.  Sure, she did something wrong that's why she
> is a cooperator.    It's clear that the jury bought that
> argument.

JA-1674.

This candid acknowledgement demonstrates that trial counsel recognized prior

to the close of the evidence that the chosen reasonable doubt strategy was a certain

failure.    Accordingly, when the opportunity arose as a result of the improper

government rebuttal, defense counsel was duty bound to request a mistrial instead of

merely seeking a curative instruction to disregard the prosecutor's incendiary final

*coup de grace* comment.

The record also establishes that trial counsel did not consult Sherri to

determine whether she wanted a mistrial. The inexplicable decision to not request a

mistrial was made almost instantaneously at the conclusion of the government's

81

rebuttal argument, without sufficient deliberation.

Lastly, the post-trial filing of a motion for a new trial based on improper closing argument does not remove this issue from ineffective counsel consideration. Had the defense moved for a mistrial at the close of rebuttal argument, the court would have necessarily considered the issue prior to verdict. This timing is significant. *Cf. Pasha*, 797 F.3d at 1134 (discussing *Brady* materiality test that expressly requires inquiry concerning "generic factfinder who has not already reached a determination of guilt beyond a reasonable doubt"). Thus, this is the "rare" case where, on this record, this Court should reverse the conviction and order a new trial on the ground that constitutionally effective counsel would have timely sought and obtained a mistrial.

### B. Other Instances of Ineffective Assistance of Counsel Raise "Colorable Claims" Which Require Remand

If this Court determines that the mistrial issue is sufficiently colorable to warrant review, but the record was not sufficiently developed below to warrant reversal of the convictions, this Court does not "hesitate to remand when a trial record is insufficient to assess the full circumstances and rationales informing the strategic decisions of trial counsel." *Pole*, 741 F.3d at 127. Additionally, Sherri raises other colorable ineffective assistance of counsel claims concerning

82

questionable "strategic" decisions that require remand to the district court under the same "non-reflexive" Circuit standard.

First, Sherri claims that counsel should have entered into evidence the government's undercover video of LaDonna that would have further established Ladonna was acting independently and possessed the requisite knowledge and savvy to devise the alleged tax scheme. The video would have shown La Donna bragging to the undercover officer that she was all alone at the business, in charge of the operation, and making all of the decisions. This evidence was alluded to during the examination of the IRS agent called as a defense witness, and further elaborated on during both post-trial *Brady* hearings. JA-1613-1614; JA-1699.

Even in the context of the chosen case-in-chief defense, no rational explanation exists why this powerful government generated video evidence, which would have reinforced Sherri's claim that she was an absentee owner lacking criminal intent, was not introduced. A picture is worth a thousand words. The video likely would have had a devastating impact on the government's case, and certainly could have adversely impacted the government's ability to establish guilt beyond a reasonable doubt.

Second, appellate counsel has reasonable cause to believe that trial counsel did not attempt to enter evidence that witness Jason Knight, Sherri's relative,

83

authored a Facebook post that referenced several of his business endeavors that were ultimately claimed on his tax returns. This evidence would have further supported the contention that she did not act unlawfully by preparing tax returns with business expenses for these businesses, but rather prepared those returns relying on at least some information provided by the taxpayer. This evidence would have also reinforced the uncontroverted evidence that Knight took similar deductions on other tax returns prepared by entities unrelated to Sherri. 1/26/15(a.m.): 154-84.

Even while pursuing a "typical" case-in-chief reasonable doubt defense, these claims raise significant questions as to why introduction of this powerful evidence was not pursued. Remand to further develop the record is necessary.

## **CONCLUSION**

Andre Davis respectfully requests that this Court reverse his convictions for insufficient evidence or, in the alternative, remand for a new trial. Sherri Davis respectfully requests that the Court reverse her convictions and remand for a new trial.

If the Court does not reverse appellants' convictions, it should vacate both

84

sentences and remand for resentencing. In addition, the Court should remand for further hearing to determine whether Sherri Davis was denied constitutionally effective assistance of counsel.

Respectfully submitted,

/S/

_____

ADAM H. KURLAND, Esq.
Howard University School of Law
2900 Van Ness Street, NW
Washington, DC 20008

(202) 806-8063

Counsel for Sherri Davis


A. J. KRAMER
FEDERAL PUBLIC DEFENDER


/S/

_____

BEVERLY G. DYER
ASSISTANT FEDERAL PUBLIC DEFENDER
Counsel for Appellant
625 Indiana Avenue, N.W. Suite 550
Washington, D.C. 20004

(202) 208-7500

85

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)(B)

I hereby certify that this brief was prepared in Times New Roman 14 point font and contains 18,889 words, in compliance with Fed. R. App. P. 32(a)(7)(B), D.C. Circuit Rule 32(a)(2), and this Court's order dated August 4, 2016, expanding the word-count limit to 19,000 words.

/S/

_____

BEVERLY G. DYER

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing Brief for Appellant, along with the accompanying Appendix for Appellant, using the appellate CM/ECF system on August 10, 2016.

Counsel for appellee, Frank P. Cihlar, frank.p.cihlar@usdoj.gov, Gregory Victor Davis, gregory.v.davis@usdoj.gov, and Alexander P. Robbins, alexander.p.robbins@usdoj.gov, are registered CM/ECF users, and will be served by the appellate CM/ECF system.

/S/

_____

BEVERLY G. DYER

86

# ADDENDUM

# TABLE OF CONTENTS

## ADDENDUM

**PAGE**

U.S. Const. - Fifth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

18 U.S.C. § 371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

18 U.S.C. § 1001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

18 U.S.C. § 3663A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

18 U.S.C. § 3664 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

18 U.S.C. § 6002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

26 U.S.C. § 7206 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

U.S.S.G. § 1B1.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

U.S.S.G. § 2T4.1 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Fed. R. Crim. P. 33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Fed. R. Evid. 401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Fed. R. Evid. 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Fed. R. Evid. 404 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Fed. R. Evid. 704 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Fed. R. Evid. 807 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

# United States Constitution

## Fifth Amendment

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

United States Code Annotated
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    Part I. Crimes (Refs & Annos)
      Chapter 19. Conspiracy

18 U.S.C.A. § 371

§ 371. Conspiracy to commit offense or to defraud United States

Currentness

<Notes of Decisions for 18 USCA § 371 are displayed in two separate documents.>

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

**CREDIT(S)**
  (June 25, 1948, c. 645, 62 Stat. 701; Pub.L. 103-322, Title XXXIII, § 330016(1)(L), Sept. 13, 1994, 108 Stat. 2147.)

Notes of Decisions (3575)

18 U.S.C.A. § 371, 18 USCA § 371
Current through P.L. 114-197. Also includes P.L. 114-199, 114-210, 114-215, and 114-216.

---

**End of Document**
© 2016 Thomson Reuters. No claim to original U.S. Government Works.

---

§ 1001. Statements or entries generally, 18 USCA § 1001

---

United States Code Annotated
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    Part I. Crimes (Refs & Annos)
      Chapter 47. Fraud and False Statements (Refs & Annos)

---

18 U.S.C.A. § 1001

§ 1001. Statements or entries generally

Effective: July 27, 2006
Currentness

(a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully--

  (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;

  (2) makes any materially false, fictitious, or fraudulent statement or representation; or

  (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both. If the matter relates to an offense under chapter 109A, 109B, 110, or 117, or section 1591, then the term of imprisonment imposed under this section shall be not more than 8 years.

(b) Subsection (a) does not apply to a party to a judicial proceeding, or that party's counsel, for statements, representations, writings or documents submitted by such party or counsel to a judge or magistrate in that proceeding.

(c) With respect to any matter within the jurisdiction of the legislative branch, subsection (a) shall apply only to--

  (1) administrative matters, including a claim for payment, a matter related to the procurement of property or services, personnel or employment practices, or support services, or a document required by law, rule, or regulation to be submitted to the Congress or any office or officer within the legislative branch; or

  (2) any investigation or review, conducted pursuant to the authority of any committee, subcommittee, commission or office of the Congress, consistent with applicable rules of the House or Senate.

**CREDIT(S)**
(June 25, 1948, c. 645, 62 Stat. 749; Pub.L. 103-322, Title XXXIII, § 330016(1)(L), Sept. 13, 1994, 108 Stat. 2147; Pub.L. 104-292, § 2, Oct. 11, 1996, 110 Stat. 3459; Pub.L. 108-458, Title VI, § 6703(a), Dec. 17, 2004, 118 Stat. 3766; Pub.L. 109-248, Title I, § 141(c), July 27, 2006, 120 Stat. 603.)

18 U.S.C.A. § 1001, 18 USCA § 1001
Current through P.L. 114-186. Also includes P.L. 114-188, 114-189, 114-191 to 114-194, 114-196, 114-197, and 114-199.

---

**End of Document**                          © 2016 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    Part II. Criminal Procedure
      Chapter 232. Miscellaneous Sentencing Provisions

18 U.S.C.A. § 3663A

§ 3663A. Mandatory restitution to victims of certain crimes

Effective: October 5, 2012
Currentness

(a)(1) Notwithstanding any other provision of law, when sentencing a defendant convicted of an offense described in subsection (c), the court shall order, in addition to, or in the case of a misdemeanor, in addition to or in lieu of, any other penalty authorized by law, that the defendant make restitution to the victim of the offense or, if the victim is deceased, to the victim's estate.

(2) For the purposes of this section, the term "victim" means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern. In the case of a victim who is under 18 years of age, incompetent, incapacitated, or deceased, the legal guardian of the victim or representative of the victim's estate, another family member, or any other person appointed as suitable by the court, may assume the victim's rights under this section, but in no event shall the defendant be named as such representative or guardian.

(3) The court shall also order, if agreed to by the parties in a plea agreement, restitution to persons other than the victim of the offense.

(b) The order of restitution shall require that such defendant--

  (1) in the case of an offense resulting in damage to or loss or destruction of property of a victim of the offense--

    (A) return the property to the owner of the property or someone designated by the owner; or

    (B) if return of the property under subparagraph (A) is impossible, impracticable, or inadequate, pay an amount equal to--

    (i) the greater of--

      (I) the value of the property on the date of the damage, loss, or destruction; or

(II) the value of the property on the date of sentencing, less

(ii) the value (as of the date the property is returned) of any part of the property that is returned;

(2) in the case of an offense resulting in bodily injury to a victim--

(A) pay an amount equal to the cost of necessary medical and related professional services and devices relating to physical, psychiatric, and psychological care, including nonmedical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment;

(B) pay an amount equal to the cost of necessary physical and occupational therapy and rehabilitation; and

(C) reimburse the victim for income lost by such victim as a result of such offense;

(3) in the case of an offense resulting in bodily injury that results in the death of the victim, pay an amount equal to the cost of necessary funeral and related services; and

(4) in any case, reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense.

(c)(1) This section shall apply in all sentencing proceedings for convictions of, or plea agreements relating to charges for, any offense--

(A) that is--

(i) a crime of violence, as defined in section 16;

(ii) an offense against property under this title, or under section 416(a) of the Controlled Substances Act (21 U.S.C. 856(a)), including any offense committed by fraud or deceit;

(iii) an offense described in section 1365 (relating to tampering with consumer products); or

(iv) an offense under section 670 (relating to theft of medical products); and

(B) in which an identifiable victim or victims has suffered a physical injury or pecuniary loss.

(2) In the case of a plea agreement that does not result in a conviction for an offense described in paragraph (1), this section shall apply only if the plea specifically states that an offense listed under such paragraph gave rise to the plea agreement.

(3) This section shall not apply in the case of an offense described in paragraph (1)(A)(ii) if the court finds, from facts on the record, that--

(A) the number of identifiable victims is so large as to make restitution impracticable; or

(B) determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.

(d) An order of restitution under this section shall be issued and enforced in accordance with section 3664.

CREDIT(S)
    (Added Pub.L. 104-132, Title II, § 204(a), Apr. 24, 1996, 110 Stat. 1227; amended Pub.L. 106-310, Div. B, Title XXXVI, § 3613(d), Oct. 17, 2000, 114 Stat. 1230; Pub.L. 112-186, § 6, Oct. 5, 2012, 126 Stat. 1430.)

18 U.S.C.A. § 3663A, 18 USCA § 3663A
Current through P.L. 114-186. Also includes P.L. 114-188, 114-189, 114-191 to 114-194, 114-196, 114-197, and 114-199.

---

End of Document                                           © 2016 Thomson Reuters. No claim to original U.S. Government Works.

USCA Case #15-3044    Document #1629586    Filed 08/16/2016

United States Code Annotated
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    Part II. Criminal Procedure
      Chapter 232. Miscellaneous Sentencing Provisions

18 U.S.C.A. § 3664

§ 3664. Procedure for issuance and enforcement of order of restitution

Effective: November 2, 2002
Currentness

(a) For orders of restitution under this title, the court shall order the probation officer to obtain and include in its presentence report, or in a separate report, as the court may direct, information sufficient for the court to exercise its discretion in fashioning a restitution order. The report shall include, to the extent practicable, a complete accounting of the losses to each victim, any restitution owed pursuant to a plea agreement, and information relating to the economic circumstances of each defendant. If the number or identity of victims cannot be reasonably ascertained, or other circumstances exist that make this requirement clearly impracticable, the probation officer shall so inform the court.

(b) The court shall disclose to both the defendant and the attorney for the Government all portions of the presentence or other report pertaining to the matters described in subsection (a) of this section.

(c) The provisions of this chapter, chapter 227, and Rule 32(c) of the Federal Rules of Criminal Procedure shall be the only rules applicable to proceedings under this section.

(d)(1) Upon the request of the probation officer, but not later than 60 days prior to the date initially set for sentencing, the attorney for the Government, after consulting, to the extent practicable, with all identified victims, shall promptly provide the probation officer with a listing of the amounts subject to restitution.

(2) The probation officer shall, prior to submitting the presentence report under subsection (a), to the extent practicable--

  (A) provide notice to all identified victims of--

    (i) the offense or offenses of which the defendant was convicted;

    (ii) the amounts subject to restitution submitted to the probation officer;

    (iii) the opportunity of the victim to submit information to the probation officer concerning the amount of the victim's losses;

    (iv) the scheduled date, time, and place of the sentencing hearing;

(v) the availability of a lien in favor of the victim pursuant to subsection (m)(1)(B); and

(vi) the opportunity of the victim to file with the probation officer a separate affidavit relating to the amount of the victim's losses subject to restitution; and

(B) provide the victim with an affidavit form to submit pursuant to subparagraph (A)(vi).

(3) Each defendant shall prepare and file with the probation officer an affidavit fully describing the financial resources of the defendant, including a complete listing of all assets owned or controlled by the defendant as of the date on which the defendant was arrested, the financial needs and earning ability of the defendant and the defendant's dependents, and such other information that the court requires relating to such other factors as the court deems appropriate.

(4) After reviewing the report of the probation officer, the court may require additional documentation or hear testimony. The privacy of any records filed, or testimony heard, pursuant to this section shall be maintained to the greatest extent possible, and such records may be filed or testimony heard in camera.

(5) If the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing. If the victim subsequently discovers further losses, the victim shall have 60 days after discovery of those losses in which to petition the court for an amended restitution order. Such order may be granted only upon a showing of good cause for the failure to include such losses in the initial claim for restitutionary relief.

(6) The court may refer any issue arising in connection with a proposed order of restitution to a magistrate judge or special master for proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court.

(e) Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence. The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government. The burden of demonstrating the financial resources of the defendant and the financial needs of the defendant's dependents, shall be on the defendant. The burden of demonstrating such other matters as the court deems appropriate shall be upon the party designated by the court as justice requires.

(f)(1)(A) In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant.

(B) In no case shall the fact that a victim has received or is entitled to receive compensation with respect to a loss from insurance or any other source be considered in determining the amount of restitution.

§ 3664. Procedure for issuance and enforcement of order of restitution, 18 USCA § 3664

(2) Upon determination of the amount of restitution owed to each victim, the court shall, pursuant to section 3572, specify in the restitution order the manner in which, and the schedule according to which, the restitution is to be paid, in consideration of--

    (A) the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled;

    (B) projected earnings and other income of the defendant; and

    (C) any financial obligations of the defendant; including obligations to dependents.

(3)(A) A restitution order may direct the defendant to make a single, lump-sum payment, partial payments at specified intervals, in-kind payments, or a combination of payments at specified intervals and in-kind payments.

(B) A restitution order may direct the defendant to make nominal periodic payments if the court finds from facts on the record that the economic circumstances of the defendant do not allow the payment of any amount of a restitution order, and do not allow for the payment of the full amount of a restitution order in the foreseeable future under any reasonable schedule of payments.

(4) An in-kind payment described in paragraph (3) may be in the form of--

    (A) return of property;

    (B) replacement of property; or

    (C) if the victim agrees, services rendered to the victim or a person or organization other than the victim.

(g)(1) No victim shall be required to participate in any phase of a restitution order.

(2) A victim may at any time assign the victim's interest in restitution payments to the Crime Victims Fund in the Treasury without in any way impairing the obligation of the defendant to make such payments.

(h) If the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.

(i) If the court finds that more than 1 victim has sustained a loss requiring restitution by a defendant, the court may provide for a different payment schedule for each victim based on the type and amount of each victim's loss and

accounting for the economic circumstances of each victim. In any case in which the United States is a victim, the court shall ensure that all other victims receive full restitution before the United States receives any restitution.

(j)(1) If a victim has received compensation from insurance or any other source with respect to a loss, the court shall order that restitution be paid to the person who provided or is obligated to provide the compensation, but the restitution order shall provide that all restitution of victims required by the order be paid to the victims before any restitution is paid to such a provider of compensation.

(2) Any amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim in--

(A) any Federal civil proceeding; and

(B) any State civil proceeding, to the extent provided by the law of the State.

(k) A restitution order shall provide that the defendant shall notify the court and the Attorney General of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay restitution. The court may also accept notification of a material change in the defendant's economic circumstances from the United States or from the victim. The Attorney General shall certify to the court that the victim or victims owed restitution by the defendant have been notified of the change in circumstances. Upon receipt of the notification, the court may, on its own motion, or the motion of any party, including the victim, adjust the payment schedule, or require immediate payment in full, as the interests of justice require.

(l) A conviction of a defendant for an offense involving the act giving rise to an order of restitution shall estop the defendant from denying the essential allegations of that offense in any subsequent Federal civil proceeding or State civil proceeding, to the extent consistent with State law, brought by the victim.

(m)(1)(A)(i) An order of restitution may be enforced by the United States in the manner provided for in subchapter C of chapter 227 and subchapter B of chapter 229 of this title; or

(ii) by all other available and reasonable means.

(B) At the request of a victim named in a restitution order, the clerk of the court shall issue an abstract of judgment certifying that a judgment has been entered in favor of such victim in the amount specified in the restitution order. Upon registering, recording, docketing, or indexing such abstract in accordance with the rules and requirements relating to judgments of the court of the State where the district court is located, the abstract of judgment shall be a lien on the property of the defendant located in such State in the same manner and to the same extent and under the same conditions as a judgment of a court of general jurisdiction in that State.

(2) An order of in-kind restitution in the form of services shall be enforced by the probation officer.

(n) If a person obligated to provide restitution, or pay a fine, receives substantial resources from any source, including inheritance, settlement, or other judgment, during a period of incarceration, such person shall be required to apply the value of such resources to any restitution or fine still owed.

(o) A sentence that imposes an order of restitution is a final judgment notwithstanding the fact that--

(1) such a sentence can subsequently be--

(A) corrected under Rule 35 of the Federal Rules of Criminal Procedure and section 3742 of chapter 235 of this title;

(B) appealed and modified under section 3742;

(C) amended under subsection (d)(5); or

(D) adjusted under section 3664(k), 3572, or 3613A; or

(2) the defendant may be resentenced under section 3565 or 3614.

(p) Nothing in this section or sections 2248, 2259, 2264, 2327, 3663, and 3663A and arising out of the application of such sections, shall be construed to create a cause of action not otherwise authorized in favor of any person against the United States or any officer or employee of the United States.

**CREDIT(S)**

(Added Pub.L. 97-291, § 5(a), Oct. 12, 1982, 96 Stat. 1255, § 3580; renumbered § 3664, Pub.L. 98-473, Title II, § 212(a) (1), Oct. 12, 1984, 98 Stat. 1987; amended Pub.L. 101-647, Title XXXV, § 3596, Nov. 29, 1990, 104 Stat. 4931; Pub.L. 104-132, Title II, § 206(a), Apr. 24, 1996, 110 Stat. 1232; Pub.L. 107-273, Div. B, Title IV, § 4002(e)(1), Nov. 2, 2002, 116 Stat. 1810.)

18 U.S.C.A. § 3664, 18 USCA § 3664
Current through P.L. 114-186. Also includes P.L. 114-188, 114-189, 114-191 to 114-194, 114-196, 114-197, and 114-199.

End of Document                                      © 2016 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
   Title 18. Crimes and Criminal Procedure (Refs & Annos)
      Part V. Immunity of Witnesses (Refs & Annos)
         Chapter 601. Immunity of Witnesses (Refs & Annos)

18 U.S.C.A. § 6002

§ 6002. Immunity generally

Currentness

Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to--

   (1) a court or grand jury of the United States,

   (2) an agency of the United States, or

   (3) either House of Congress, a joint committee of the two Houses, or a committee or a subcommittee of either House,

and the person presiding over the proceeding communicates to the witness an order issued under this title, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.

**CREDIT(S)**
   (Added Pub.L. 91-452, Title II, § 201(a), Oct. 15, 1970, 84 Stat. 927; amended Pub.L. 103-322, Title XXXIII, § 330013(4), Sept. 13, 1994, 108 Stat. 2146.)

18 U.S.C.A. § 6002, 18 USCA § 6002
Current through P.L. 114-186. Also includes P.L. 114-188, 114-189, 114-191 to 114-194, 114-196, 114-197, and 114-199.

**End of Document**
© 2016 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 26. Internal Revenue Code (Refs & Annos)
    Subtitle F. Procedure and Administration (Refs & Annos)
      Chapter 75. Crimes, Other Offenses, and Forfeitures
        Subchapter A. Crimes
          Part I. General Provisions (Refs & Annos)

26 U.S.C.A. § 7206

§ 7206. Fraud and false statements

Currentness

Any person who--

**(1) Declaration under penalties of perjury.**--Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter; or

**(2) Aid or assistance.**--Willfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document; or

**(3) Fraudulent bonds, permits, and entries.**--Simulates or falsely or fraudulently executes or signs any bond, permit, entry, or other document required by the provisions of the internal revenue laws, or by any regulation made in pursuance thereof, or procures the same to be falsely or fraudulently executed, or advises, aids in, or connives at such execution thereof; or

**(4) Removal or concealment with intent to defraud.**--Removes, deposits, or conceals, or is concerned in removing, depositing, or concealing, any goods or commodities for or in respect whereof any tax is or shall be imposed, or any property upon which levy is authorized by section 6331, with intent to evade or defeat the assessment or collection of any tax imposed by this title; or

**(5) Compromises and closing agreements.**--In connection with any compromise under section 7122, or offer of such compromise, or in connection with any closing agreement under section 7121, or offer to enter into any such agreement, willfully--

  **(A) Concealment of property.**--Conceals from any officer or employee of the United States any property belonging to the estate of a taxpayer or other person liable in respect of the tax, or

**(B) Withholding, falsifying, and destroying records.**--Receives, withholds, destroys, mutilates, or falsifies any book, document, or record, or makes any false statement, relating to the estate or financial condition of the taxpayer or other person liable in respect of the tax;

shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 3 years, or both, together with the costs of prosecution.

**CREDIT(S)**

(Aug. 16, 1954, c. 736, 68A Stat. 852; Sept. 3, 1982, Pub.L. 97-248, Title III, § 329(c), 96 Stat. 618.)

Notes of Decisions (550)

26 U.S.C.A. § 7206, 26 USCA § 7206
Current through P.L. 114-197. Also includes P.L. 114-199, 114-210, 114-215, and 114-216.

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.

> United States Code Annotated
>   Federal Sentencing Guidelines (Refs & Annos)
>     Chapter One. Introduction, Authority, and General Application Principles (Refs & Annos)
>       Part B. General Application Principles

USSG, § 1B1.3, 18 U.S.C.A.

§ 1B1.3. Relevant Conduct (Factors that Determine the Guideline Range)

Currentness

**(a) Chapters Two (Offense Conduct) and Three (Adjustments).** Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:

**(1)(A)** all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

**(B)** in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were--

**(i)** within the scope of the jointly undertaken criminal activity,

**(ii)** in furtherance of that criminal activity, and

**(iii)** reasonably foreseeable in connection with that criminal activity;

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

**(2)** solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

**(3)** all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and

**(4)** any other information specified in the applicable guideline.

**(b) Chapters Four (Criminal History and Criminal Livelihood) and Five (Determining the Sentence).** Factors in Chapters Four and Five that establish the guideline range shall be determined on the basis of the conduct and information specified in the respective guidelines.

<[Commentary to Guideline is located in Historical Note field. The following credit reflects amendments to both Guideline and Commentary.]>

**CREDIT(S)**

(Effective November 1, 1987; amended effective January 15, 1988; November 1, 1989; November 1, 1990; November 1, 1991; November 1, 1992; November 1, 1994; November 1, 2001; November 1, 2004; November 1, 2010; November 1, 2015.)

Federal Sentencing Guidelines, § 1B1.3, 18 U.S.C.A., FSG § 1B1.3
As amended to 7-13-16

---

**End of Document**                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

*Application Notes:*

1.  *A sentence at or near the minimum of the guideline range typically would be appropriate for cases involving tourists who bring in items for their own use. Such conduct generally poses a lesser threat to revenue collection.*

2.  *Particular attention should be given to those items for which entry is prohibited, limited, or restricted. Especially when such items are harmful or protective quotas are in effect, the duties evaded on such items may not adequately reflect the harm to society or protected industries resulting from their importation. In such instances, an upward departure may be warranted. A sentence based upon an alternative measure of the "duty" evaded, such as the increase in market value due to importation, or 25 percent of the items' fair market value in the United States if the increase in market value due to importation is not readily ascertainable, might be considered.*

3.  *Sophisticated Means.—For purposes of subsection (b)(1), "sophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts ordinarily indicates sophisticated means.*

<u>Historical Note</u>: Effective November 1, 1987. Amended effective November 1, 1989 (<u>see</u> Appendix C, amendment 235); November 1, 1991 (<u>see</u> Appendix C, amendment 410); November 1, 1992 (<u>see</u> Appendix C, amendment 453); November 1, 1998 (<u>see</u> Appendix C, amendment 577); November 1, 2001 (<u>see</u> Appendix C, amendment 617); November 1, 2006 (<u>see</u> Appendix C, amendment 685).

## §2T3.2.  [Deleted]

<u>Historical Note</u>: Section 2T3.2 (Receiving or Trafficking in Smuggled Property), effective November 1, 1987, amended effective November 1, 1989 (<u>see</u> Appendix C, amendment 236) and November 1, 1991 (<u>see</u> Appendix C, amendment 410), was deleted by consolidation with §2T3.1 effective November 1, 1992 (<u>see</u> Appendix C, amendment 453).

*        *        *        *        *

4.    TAX TABLE

## §2T4.1.    <u>Tax Table</u>

| <u>Tax Loss</u> (Apply the Greatest) | | <u>Offense Level</u> |
|---|---|---|
| (A) | $2,000 or less | 6 |
| (B) | More than $2,000 | 8 |
| (C) | More than $5,000 | 10 |
| (D) | More than $12,500 | 12 |
| (E) | More than $30,000 | 14 |
| (F) | More than $80,000 | 16 |
| (G) | More than $200,000 | 18 |
| (H) | More than $400,000 | 20 |

1 8

| | | |
|---|---|---|
| (I) | More than $1,000,000 | 22 |
| (J) | More than $2,500,000 | 24 |
| (K) | More than $7,000,000 | 26 |
| (L) | More than $20,000,000 | 28 |
| (M) | More than $50,000,000 | 30 |
| (N) | More than $100,000,000 | 32 |
| (O) | More than $200,000,000 | 34 |
| (P) | More than $400,000,000 | 36. |

Historical Note: Effective November 1, 1987. Amended effective November 1, 1989 (see Appendix C, amendment 237); November 1, 1993 (see Appendix C, amendment 491); November 1, 2001 (see Appendix C, amendment 617); January 25, 2003 (see Appendix C, amendment 647); November 1, 2003 (see Appendix C, 653).

United States Code Annotated
   Federal Rules of Criminal Procedure for the United States District Courts (Refs & Annos)
      VII. Post-Conviction Procedures

Federal Rules of Criminal Procedure, Rule 33

Rule 33. New Trial

Currentness

**(a) Defendant's Motion.** Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. If the case was tried without a jury, the court may take additional testimony and enter a new judgment.

**(b) Time to File.**

   **(1) Newly Discovered Evidence.** Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty. If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case.

   **(2) Other Grounds.** Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty.

**CREDIT(S)**
   (As amended Feb. 28, 1966, eff. July 1, 1966; Mar. 9, 1987, eff. Aug. 1, 1987; Apr. 24, 1998, eff. Dec. 1, 1998; Apr. 29, 2002, eff. Dec. 1, 2002; Apr. 25, 2005, eff. Dec. 1, 2005; Mar. 26, 2009, eff. Dec. 1, 2009.)

Fed. Rules Cr. Proc. Rule 33, 18 U.S.C.A., FRCRP Rule 33
Including Amendments Received Through 6-1-16

---

End of Document
© 2016 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
Federal Rules of Evidence (Refs & Annos)
Article IV. Relevance and Its Limits

Federal Rules of Evidence Rule 401, 28 U.S.C.A.

Rule 401. Test for Relevant Evidence

Currentness

Evidence is relevant if:

(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and

(b) the fact is of consequence in determining the action.

**CREDIT(S)**

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat.1931; Apr. 26, 2011, eff. Dec. 1, 2011.)

Fed. Rules Evid. Rule 401, 28 U.S.C.A., FRE Rule 401
Including Amendments Received Through 6-1-16

**End of Document**                                         © 2016 Thomson Reuters. No claim to original U.S. Government Works.

| United States Code Annotated |
| Federal Rules of Evidence (Refs & Annos) |
| Article IV. Relevance and Its Limits |

Federal Rules of Evidence Rule 403, 28 U.S.C.A.

Rule 403. Excluding Relevant Evidence for Prejudice, Confusion, Waste of Time, or Other Reasons

Currentness

The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

**CREDIT(S)**

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat. 1932; Apr. 26, 2011, eff. Dec. 1, 2011.)

Fed. Rules Evid. Rule 403, 28 U.S.C.A., FRE Rule 403
Including Amendments Received Through 6-1-16

**End of Document**    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Rule 404. Character Evidence; Crimes or Other Acts, FRE Rule 404

---

United States Code Annotated
  Federal Rules of Evidence (Refs & Annos)
    Article IV. Relevance and Its Limits

---

Federal Rules of Evidence Rule 404, 28 U.S.C.A.

Rule 404. Character Evidence; Crimes or Other Acts

Currentness

**(a) Character Evidence.**

**(1) Prohibited Uses.** Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait.

**(2) Exceptions for a Defendant or Victim in a Criminal Case.** The following exceptions apply in a criminal case:

**(A)** a defendant may offer evidence of the defendant's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it;

**(B)** subject to the limitations in Rule 412, a defendant may offer evidence of an alleged victim's pertinent trait, and if the evidence is admitted, the prosecutor may:

**(i)** offer evidence to rebut it; and

**(ii)** offer evidence of the defendant's same trait; and

**(C)** in a homicide case, the prosecutor may offer evidence of the alleged victim's trait of peacefulness to rebut evidence that the victim was the first aggressor.

**(3) Exceptions for a Witness.** Evidence of a witness's character may be admitted under Rules 607, 608, and 609.

**(b) Crimes, Wrongs, or Other Acts.**

**(1) Prohibited Uses.** Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

**(2) Permitted Uses; Notice in a Criminal Case.** This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. On request by a defendant in a criminal case, the prosecutor must:

**(A)** provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and

**(B)** do so before trial--or during trial if the court, for good cause, excuses lack of pretrial notice.

### CREDIT(S)

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat.1932; Mar. 2, 1987, eff. Oct. 1, 1987; Apr. 30, 1991, eff. Dec. 1, 1991; Apr. 17, 2000, eff. Dec. 1, 2000; Apr. 12, 2006, eff. Dec. 1, 2006; Apr. 26, 2011, eff. Dec. 1, 2011.)

Fed. Rules Evid. Rule 404, 28 U.S.C.A., FRE Rule 404
Including Amendments Received Through 6-1-16

**End of Document**    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Federal Rules of Evidence (Refs & Annos)
    Article VII. Opinions and Expert Testimony

Federal Rules of Evidence Rule 704, 28 U.S.C.A.

Rule 704. Opinion on an Ultimate Issue

Currentness

**(a) In General--Not Automatically Objectionable.** An opinion is not objectionable just because it embraces an ultimate issue.

**(b) Exception.** In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone.

**CREDIT(S)**
  (Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat. 1937; Pub.L. 98-473, Title IV, § 406, Oct. 12, 1984, 98 Stat. 2067; Apr. 26, 2011, eff. Dec. 1, 2011.)

Fed. Rules Evid. Rule 704, 28 U.S.C.A., FRE Rule 704
Including Amendments Received Through 6-1-16

**End of Document**　　　　　　　　　　　© 2016 Thomson Reuters. No claim to original U.S. Government Works.

| United States Code Annotated |
| --- |
| Federal Rules of Evidence (Refs & Annos) |
| Article VIII. Hearsay (Refs & Annos) |

Federal Rules of Evidence Rule 807, 28 U.S.C.A.

Rule 807. Residual Exception

Currentness

**(a) In General.** Under the following circumstances, a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804:

**(1)** the statement has equivalent circumstantial guarantees of trustworthiness;

**(2)** it is offered as evidence of a material fact;

**(3)** it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and

**(4)** admitting it will best serve the purposes of these rules and the interests of justice.

**(b) Notice.** The statement is admissible only if, before the trial or hearing, the proponent gives an adverse party reasonable notice of the intent to offer the statement and its particulars, including the declarant's name and address, so that the party has a fair opportunity to meet it.

**CREDIT(S)**
(Added Apr. 11, 1997, eff. Dec. 1, 1997; Apr. 26, 2011, eff. Dec. 1, 2011.)

Fed. Rules Evid. Rule 807, 28 U.S.C.A., FRE Rule 807
Including Amendments Received Through 6-1-16

**End of Document**                            © 2016 Thomson Reuters. No claim to original U.S. Government Works.